Jones, J.
We hold that the New York no-fault automobile accident compensation law is not unconstitutional. This case comes to us on direct appeal (NY Const, art VI, § 3, subd b, par [2]; CPLR 5601, subd [b], par 2) from a judgment at Special Term which, on cross motions for summary judgment, declared article 18 of the Insurance Law in violation of the due process and equal protection clauses of the Federal and *46 State Constitutions and a denial of the right to trial by jury guaranteed by our State Constitution.

The New York No-Fault Act

We first describe this insurance program.
Under the title, "Comprehensive Automobile Insurance Reparations Act”, article 18 of the Insurance Law (as added by L 1973, ch 13, in full effect Feb. 1, 1974) provides a plan for compensating victims of automobile accidents without regard to fault. In essence, it is a two-pronged, partial modification of the pre-existing system of reparation for personal injuries suffered in automobile accidents under which system liability was grounded in negligence under classic principles of tort law. One prong deals with compensation; the other with limitation of tort actions.
The first prong lays down the requirement that every owner of a motor vehicle provide himself, members of his household, operators, occupants and pedestrians with compensation for "basic economic loss” resulting from injuries occasioned by the use or operation of that vehicle in this State, regardless of fault (§ 672, subd 1). "Motor vehicle” is defined to exclude motorcycles from the act’s coverage (§ 671, subd 6). "Basic economic loss”, subject to a maximum of $50,000 per person, is defined to include:
(a) Treatment Expense—All "reasonable and necessary expenses” for medical, hospital, surgical, nursing, dental, ambulance, X ray, prescription drug and prosthetic services, as well as for psychiatric care, other professional health services, and any nonmedical remedial care rendered in accordance with a religious method of healing recognized by the laws of this State, all without limitation as to time, provided that, within one year after, the date of the accident causing injury, it is ascertainable that further expenses may be incurred as a result of the injury (§ 671, subd 1, par [a]);
(b) Lost Earnings—Loss of earnings and expenses incurred in obtaining substitute services up to $1,000 per month for not more than three years from the date of the accident (§ 671, , subd 1, par [b]); and
(c) Other Expenses—All other reasonable and necessary expenses incurred, up to $25 per day for not more than one year from the date of the accident (§ 671, subd 1, par [c]).
Compensation for basic economic loss is payable as "first *47 party benefits” after reducing the gross amount of such loss by deducting (a) 20% of "lost earnings” (§ 671, subd 2, par [a]), (b) all amounts recoverable under State or Federal laws providing social security disability benefits or workmen’s compensation benefits (§671, subd 2, par [b]), and (c) amounts deductible under the applicable insurance policy (§ 671, subd 2, par [c]). "First party benefits” become due and payable "as the loss is incurred” and "are overdue if not paid within thirty days after the claimant supplies proof of the fact and amount of loss sustained” (§ 675, subd 1). Any dispute with the insurer as to benefits may be resolved expeditiously by submission to binding arbitration at the option of the claimant (§ 675, subd 2).
The right to first-party benefits accrues to the injured person regardless of fault or negligence on the part of the covered person, except that the insurer may exclude from coverage a person who intentionally causes his own injury, is injured as a result of operating a motor vehicle while in an intoxicated condition or while his ability to operate such vehicle is impaired by the use of a drug, or is injured while committing an act which would constitute a felony, seeking to avoid lawful apprehension or arrest, participating in a race or speed test, or operating or occupying a vehicle he knows to be stolen (§ 672, subd 2).
The second prong of the act imposes two limitations on tort recovery for personal injuries, applicable, however, only to actions between "covered persons” (as defined in § 671, subd 10): (1) there can be no duplicate tort compensation for "basic economic loss” (§ 673, subd 1); and (2) damages for noneconomic loss (i.e., pain and suffering) are not recoverable in tort unless the plaintiff can establish that he has suffered a "serious injury” (§ 673, subd 1). Serious injury is defined in subdivision 4 of section 671 as a personal injury:
"(a) which results in death; dismemberment; significant disfigurement; a compound or comminuted fracture; or permanent loss of use of a body organ, member, function, or system; or
"(b) if the reasonable and customary charges for medical, hospital, surgical, nursing, dental, ambulance, x-ray, prescription drug and prosthetic services necessarily performed as a result of the injury would exceed five hundred dollars.”
Thus, an injured party may bring a third-party tort action and may recover therein for economic loss over $50,000, for *48 treatment expenses not ascertainable within one year of injury, for lost earnings which exceed $1,000 per month or continue beyond three years, and for other reasonable and necessary expenses which exceed $25 per day or continue after one year. Damages for pain and suffering may likewise still be recovered in a tort action if there was a "serious injury”. Finally, article 18 erects no bar whatever to tort actions seeking recovery for personal injury against noncovered persons or for property damage against covered or non-covered persons.

Plaintiffs’ Claims

Plaintiffs, each of whom was injured in a separate automobile accident occurring after February 1, 1974, the effective date of article 18, joined together in this action against their respective alleged tort-feasors and insurers seeking a declaration that article 18 is unconstitutional and void in its entirety. Plaintiffs allege in each case that because the reasonable and customary charges for medical treatment for their respective injuries will not exceed $500, they are barred under the challenged law from commencing an action for their injuries and particularly for the pain and suffering allegedly occasioned thereby. Plaintiffs’ constitutional attack on article 18 is multifaceted and can be summarized as follows:
(1) Article 18 is in contravention of the due process clauses of the Federal and State Constitutions because it is without rational relationship to its purported purposes, because it abolishes plaintiffs’ common-law tort remedies as motor vehicle accident victims without providing a reasonable substitute remedy, and because the phrase "significant disfigurement” as used to define a "serious injury” (§ 671, subd 4, par [a]) is void for vagueness;
(2) Article 18 violates the equal protection clauses of the Federal and State Constitutions because, in declaring who shall and who shall not be precluded from maintaining a tort action for noneconomic losses (pain and suffering), the statute establishes arbitrary and irrational classifications between persons injured by covered persons and those injured by noncovered persons (§ 671, subd 10; § 673), between those persons whose treatment expenses exceed $500 and those whose expenses fall below that threshold amount (§ 671, subd 4, par [b]; § 673), and between injuries defined as "serious” and *49 those excluded from that definition (§ 671, subd 4, par [a]; § 673); and
(3) Article 18 violates the trial by jury provision of the New York State Constitution (art I, § 2).
Plaintiffs’ assertions of unconstitutionality focus, of course, on the details of article 18. We note, however, that to a very large extent the methodology of their assault would be equally applicable (or as we hold inapplicable) to any no-fault plan whatever its specifics. The techniques of their attack are those which are always available to challenge any statute in which lines of demarcation must be laid down—contentions predicated, at least implicitly, on the assumption that to draw any line involves an element of the arbitrary, that wherever the line is drawn instances can be suggested which appear to involve inequitable inclusion or exclusion (see, infra, p 64). The ineluctable projection of plaintiffs’ arguments is that our Legislature does not have authority to adopt any no-fault plan.

Prepassage Studies and Proceedings

Before turning to an analysis of the constitutional claims advanced, it will be helpful to review some of the studies and proceedings which preceded enactment of article 18.
Debate over the efficacy of the tort system of compensating automobile accident victims has raged for over 40 years.[1] Our Legislature in 1973 thus had available to it a staggering number of reports and studies which provided analysis of the concept of a no-fault system of reparations and to which our attention is now drawn by both plaintiffs and defendants on this appeal.[2] These studies identify at least four basic infirmi *50 ties or defects in the common-law fault system of automobile accident reparation for personal injuries. For the purposes of this appeal, we recognize these four infirmities or defects as predicates for the Legislature’s enactment of article 18.[3]
The first infirmity was the acknowledged fact that exposure to the risk of tort liability did not function as a significant factor in motivating drivers to operate their vehiclés carefully or prudently. (DOT Report, at pp 53-57; Insurance Department Report, at pp 12-13;[4] Keeton and O’Connell, at pp 247-249.) Nothing in the new no-fault act seeks to remedy this infirmity; indeed the new law apparently proceeds on the assumption that threat of economic disadvantage, by way either of increased insurance premiums or of excess recoveries, is no effective deterrent to bad driving.
Secondly it was urged that the tort system was excessively and needlessly expensive and inefficient. Keeton and O’Connell (at p 70, n 190) and the DOT Report (at p 51) both concluded that half or perhaps less than half of the automobile liability insurance premium dollar was paid in actual compensation to accident victims. The Insurance Department Report stated (at p 35) that only 44 cents of the premium dollar reached the injured claimants.
Thirdly it was urged that the distribution of compensation *51 among accident victims under the tort system of reparation was unfair and inequitable for a number of reasons. The most revealing statistic reported was that one quarter of the persons who sustained bodily injury in auto accidents in New York received no compensation whatsoever (Insurance Department Report, at p 18). Where the tort system did provide recompense, the statistics further revealed that minor injuries were often overcompensated (at least in terms of readily ascertainable medical expenses) while those suffering serious injuries were being underpaid.[5] Moreover it was concluded in all reports that the tort system was plagued by long delays in claim payment.[6]
As a fourth major inadequacy of the fault system of reparation, it was argued that the system placed an inordinate strain on the State’s court systems and judicial resources. (See, generally, Insurance Department Report, at pp 19-24; DOT Report, at pp 70-79; and Keeton and O’Connell, at pp 13-15.)
In March, 1970 the Governor sent the first proposed legislation for implementing no-fault concepts in this State to the Legislature accompanied by a special message (reprinted in 111th Annual Report of the Superintendent of Insurance to the Legislature for 1969 [1970], at pp 329-331). Public hearings were held on the proposed bill, but no action was taken that year. In 1971 the Governor followed a similar procedure (see 112th Annual Report of the Superintendent of Insurance to the Legislature for 1970 [1971], at pp 155-157) and more hearings were held, but again no action was taken on any of *52 the at least five bills before the Legislature. In 1972 even more extensive hearings were held at which some 90 witnesses testified including the Governor, Superintendent of Insurance and Federal Insurance Administrator, but again no legislative action was taken. In 1973, however, the act which is here under scrutiny was passed and signed into law as chapter 13.[7] This synopsis of article 18’s legislative history is presented to demonstrate that the Legislature acted only after unusually extensive study and investigation and on what must be accepted for purposes of judicial review as an uncommonly sturdy legislative basis,.
It is additionally worth noting that prior to February 1, 1974, the effective date of article 18, 13 other jurisdictions had enacted various forms of no-fault insurance laws.[8] In those jurisdictions where the courts of last resort have passed on the constitutionality of the no-fault plans enacted by their respective Legislatures, all but one have sustained the legislation.[9]
*53 It remains here only to add that we recognize that other studies and data can be cited which tend to refute the conclusions on which our Legislature predicated its enactment of article 18. The judiciary, however, is not called on to weigh the relative worth of data or arguments which may be marshaled on either side as to the wisdom of determinations made by the Legislature in the realm of policy. "Whether the enactment is wise or unwise, whether it is based on sound economic theory, whether it is the best means to achieve the desired result, whether, in short, the legislative discretion within its prescribed limits should be exercised in a particular manner, are matters for the judgment of the legislature, and the earnest conflict of serious opinion does not suffice to bring them within the range of judicial cognizance.” (Chicago, Burlington & Quincy R. R. Co. v McGuire, 219 US 549, 569; see, also, infra, pp 54-55, 56, 64.)
In this instance, perhaps more than in most, in the light of the exhaustive and vigorous public discussion of no-fault insurance in this State and elsewhere and the extended legislative consideration which preceded adoption of article 18, it would be a demonstration of judicial arrogation and highly inept and inapt to express any opinion as to the factual predicate for this legislation, its philosophical justification or the ultimate wisdom of its enactment. It is not our office to rejoice or to lament. A fair regard for the basic polity of separation of powers dictates judicial respect for the proper role of the legislative branch, and pride in the uniquely and essentially neutral role of the judicial branch. That judicial role is both a privilege and a limitation.

Due Process Issues

We turn then to consideration of the several arguments advanced to support the contention that article 18 is unconstitutional.
We conclude that the partial abolition here of an accident victim’s right to sue for damages caused by another’s negligent action does not deprive the victim of a right or interest protected by the due process clause of either our State or the Federal Constitution.
*54 In West Coast Hotel Co. v Parrish (300 US 379, 391) the United States Supreme Court stated that "regulation which is reasonable in relation to its subject and is adopted in the interests of the community is due process”. Thus where a statute is challenged on nonprocedural grounds as violative of due process of law we have consistently asked the question whether there is "' "some fair, just and reasonable connection” between it and the promotion of the health, comfort, safety and welfare of society’ ”. (Nettleton Co. v Diamond, 27 NY2d 182, 193, app dsmd sub nom. Reptile Prods. Assn. v Diamond, 401 US 969; People v Pagnotta, 25 NY2d 333, 337; People v Bunis, 9 NY2d 1, 4; Defiance Milk Prods. Co. v Du Mond, 309 NY 537, 541.) In approaching this question, the court has recognized that as a matter of substantive law every legislative enactment is deemed to be constitutional until its challengers have satisfied the court to the contrary (People v Broadie, 37 NY2d 100, 117; People v Pagnotta, supra; Matter of Van Berkel v Power, 16 NY2d 37, 40; I.L.F.Y. Co. v Temporary State Housing Rent Comm., 10 NY2d 263, 269, app dsmd 369 US 795). "There is generally a very strong presumption that 'the Legislature has investigated and found the existence of a situation showing or indicating the need for or desirability of the legislation’ ” (Matter of Taylor v Sise, 33 NY2d 357, 364, quoting Matter of Van Berkel v Power, supra; and see People v Broadie, supra).
Thus this aspect of plaintiffs’ challenge is to be viewed as presenting two inquiries: in enacting article 18 was the Legislature acting in pursuit of permissible State objectives and, if so, were the means adopted in article 18 reasonably related to the accomplishment of those objectives? We conclude that each inquiry must be answered in the affirmative.
Within the police powers of a State is the power to regulate the use of the motor vehicle as well as liability which may arise out of such use. In sustaining Connecticut’s power to enact a "guest statute” abrogating the common-law right of a guest in an automobile to recover for the negligence of his host, the United States Supreme Court stated: "Whether there has been a serious increase in the evils of vexatious litigation in this class of cases, where the carriage is by automobile, is for legislative determination and, if found, may well be the basis of legislative action further restricting the liability. Its wisdom is not the concern of the courts.” (Silver v Silver, 280 *55 US 117, 123.) In enacting article 18 to modify the fault system of automobile reparation for personal injury, our Legislature was surely acting within a recognized and legitimate area of its police powers. Indeed article 18 works less deprivation than that upheld in Silver (supra). The Legislature was acting to correct what it viewed as at least four basic infirmities or defects in that fault system and was acting on the basis of findings which certainly supported its perception of the problems (see Silver, supra). Plaintiffs’ claim that "examination of these 'evils’ of the tort system shows that in fact no such problem exists” must be rejected. "Where the question of what the facts establish is a fairly-debatable one, we accept and carry into effect the opinion of the legislature.” (Lincoln Bldg. Assoc. v Barr, 1 NY2d 413, 415, app dsmd 355 US 12, quoting Old Dearborn Co. v Seagram Corp., 299 US 183, 196.) This judicial approach takes on added substance where the Legislature has engaged in extensive and thorough investigation as in this instance. (See People v Broadie, 37 NY2d 100, 117, supra.)
Likewise, we reject plaintiffs’ argument that there is no reasonable basis between reform as undertaken in article 18 and the objective of remedying the defects perceived by the Legislature to inhere in the fault-based tort system for compensating automobile accident personal injury claimants. On the contrary we conclude that, by eliminating recovery for pain and suffering in relatively minor cases and by simultaneously guaranteeing prompt and full compensation for economic losses up to $50,000 without the necessity of recourse to the courts, the Legislature acted reasonably to eliminate much of the wasted expenditures of premium dollars on expenses extraneous to treatment of injury .(e.g., legal and investigative costs involved in determining fault and in establishing the value of the alleged pain and suffering). Such action may further be viewed as reasonably related to guaranteeing full and fair recovery to all victims by reducing pressure on a seriously injured person to compromise down his claims in order to obtain funds for treatment while at the same time eliminating pressure on insurers to compromise up claims by persons suffering minor injuries in order to avoid the expense of investigating and defending against such minor claims. Finally, it cannot be said that by partially obviating recourse to the courts the statute was unreasonable in relation to its purpose to reduce the long delays in the payment of *56 claims experienced under judicial procedures and to lessen the burden on;our State courts and judicial resources.
In so holding it is not necessary for us to conclude that article 18 represents the only or necessarily the wisest response which the Legislature could have taken to accomplish the objectives sought. "Assuming that there were other effective methods by which to accomplish the same end, this court should not substitute its judgment for that of the Legislature in determining the particular method to meet a given need”. (Matter-of Taylor v Sise, 33 NY2d 357, 365, supra.) Nor is it necessary to conclude that article 18 will surely accomplish the ends sought to be achieved, for "only time will tell whether the course pursued will prove effective or will fail” (People v Broadie, 37 NY2d 100, 118, supra). We hold only that article 18 is reasonably related to the promotion of the public welfare and thus represents .a legitimate exercise of our State’s police power.
Plaintiffs posit another due process claim on the argument that article 18 unconstitutionally abrogates their common-law right to sue in tort without providing an adequate substitute remedy. This "adequate substitute remedy test” derives from dictum found in the United States Supreme Court opinion of 1917 in New York Cent. R. R. Co. v White (243 US 188, 201) where in rejecting challenges to our State’s new workmen’s compensation law, the court wrote: "it perhaps may be doubted whether the State could abolish all rights of action on the one hand, or all defenses on the other, without setting up something adequate in their stead.” The court went on to state, however: "No such question is here presented, and we intimate no opinion upon it.”
Serious question exists as to whether this "adequate substitute test” is any test at all. In Munn v Illinois (94 US 113, 134) the court had been unequivocal in its statement that: "A person has no property, no vested interest, in any rule of the common law. That is only one of the forms of municipal law, and is no more sacred than any other. Rights of property which have been created by the common law cannot be taken away without due process; but the law itself, as a rule of conduct, may be changed at the will, or even at the whim, of the legislature, unless prevented by constitutional limitations. Indeed, the great office of statutes is to remedy defects in the common law as they are developed, and to adapt it to the changes of time and circumstances.” In Arizona Employers’ *57 Liab. Cases (250 US 400, 421) the court later repeated those principles in the following language: "But [common-law tort rules] are no more than rules of law, deduced by the courts as reasonable and just, under the conditions of our civilization, in view of the relations existing between employer and employee in the absence of legislation. They are not placed, by the Fourteenth Amendment, beyond the reach of the State’s power to alter them, as rules of future conduct and tests of responsibility, through legislation designed to promote the general welfare”. Finally, in Silver v Silver (280 US 117, 122, supra) the court in a further dictum appeared totally to have undercut its earlier dictum in the White case by citing "the rule that the Constitution does not forbid the creation of new rights, or the abolition of old ones recognized by the common law, to attain a permissible legislative object”.
It should also be noted that our State Constitution expressly recognizes the power of the Legislature to alter the common law. Section 14 of article I in adopting the common law in effect on April 19, 1775 goes on to add explicitly, "subject to such alterations as the legislature shall make concerning the same”.
Many States have abolished common-law causes of action by statute without providing any substitute remedy at all, e.g., the common-law right of a guest in an automobile to recover for the negligence of his host,[10] or the common-law right of a party to sue in tort or contract for breach of promise to marry or for alienation of affections.[11]
For the purposes of disposing of this appeal we conclude, however, that it is unnecessary to decide when, if ever, due process requires that a Legislature in abrogating causes of action under the common law must provide an adequate substitute remedy. If adequacy of the replacement were to be required, a systemic comparison would be appropriate—the measure of the new system as an adequate substitute for the common-law system. It would be immaterial that a particular claimant might have fared significantly better under the former system. As the United States Supreme Court concluded *58 in White, we would conclude here that the issue is not present because under any analysis the law now challenged provides more than an adequate substitute for the cause of action it abrogates.[12] We find the statement of the White court equally applicable in the present case. "The statute under consideration sets aside one body of rules only to establish another system in its place. If the employee is no longer able to recover as much as before in case of being injured through the employer’s negligence, he is entitled to moderate compensation in all cases of injury, and has a certain and speedy remedy without the difficulty qnd expense of establishing negligence or proving the amount of damages.” (243 US, at p 201.)
Finally under the due process heading, we find no merit in plaintiffs’ additional claim that the term "significant disfigurement”, as used in section 671 (subd 4, par [a]) to define a "serious injury”, is unconstitutionally vague. While it is true that civil as well as penal statutes can be tested for vagueness under the due process clause (Giaccio v Pennsylvania, 382 US 399, 402), we find the words "significant disfigurement” well within that test. "While these are abstract words, they have through daily use acquired a content that conveys to any interested person a sufficiently accurate concept”. (Kovacs v Cooper, 336 US 77, 79.) The challenged phrase is no less vague than that found in our State’s Workmen’s Compensation Law (§ 15, subd 3, par t, cl 1) which provides that the "board may award proper and equitable compensation for serious facial and head disfigurement”—a provision which has been interpreted and applied without constitutional difficulty. (See, e.g., Matter of Sweeting v American Knife Co., 226 NY 199, affd sub nom. New York Cent. R. R. Co. v Bianc, 250 US 596; Matter of Erickson v Preuss, 223 NY 365; Matter of Hildreth v Ford Motor Co., 14 AD2d 963.) Similarly, the Longshoremen’s and Harbor Workers’ Compensation Act (US Code, tit 33, § 901 et seq.) states in section 908 (subd [c], par [20]) that *59 "[p]r°per and equitable compensation not to exceed $3,500 shall be awarded for serious disfigurement of the face”. This provision has also been interpreted and applied without constitutional difficulty. (See, e.g., Rupert v Todd Shipyards Corp., 239 F2d 273.)[13]

Equal Protection Claims

In addressing plaintiffs’ equal protection arguments there is a threshold issue which must first be resolved, namely, what standard of review is to be applied. Plaintiffs argue that the challenged provisions of article 18 can be sustained only if the State can demonstrate that such statutory provisions are necessary to the advancement of a compelling State interest and additionally only if it can then be shown there are no less restrictive means by which the advancement of such an interest could be achieved. We reject plaintiffs’ argument in support of this strict scrutiny test and choose rather to apply the traditional rational basis test to the equal protection claims made herein.
The strict scrutiny test is to be invoked only where a challenged law can be said to create classifications drawn along suspect lines or which impair some fundamental constitutional right.[14] It is not here contended, nor could it be, that article 18 involves any suspect classification. Rather plaintiffs argue that the law infringes on the right of an individual "to the security of his person” and on the fundamental right of "access to the courts.”[15] Plaintiffs seek here under claims of equal protection to assert rights which they argue have been accorded special constitutional protection in other situations *60 under claims of due process. In our analysis, their difficulty lies not as to whether the asserted denial is of equal protection or of due process; the problem is that the underlying right itself is not one which has been recognized as entitled to special constitutional protection.
Article 18 certainly does not interfere with any right to "security of the person” as that right was recognized by the United States Supreme Court in Griswold v Connecticut (381 US 479) or Eisenstadt v Baird (405 US 438) cases cited by plaintiffs. Rather than depriving plaintiffs of legal protection to their persons, article 18 has simply altered the economic remedy available for injury to their persons.
Likewise plaintiffs’ reliance on Boddie v Connecticut (401 US 371) for the claim that article 18 unconstitutionally denies to them a fundamental right of "access to the courts” is misplaced. In Boddie and in subsequent cases clarifying Bod-die (e.g., Ortwein v Schwab, 410 US 656; United States v Kras, 409 US 434) the Supreme Court has made it clear that access to the courts in and of itself is not an independent constitutional right. The right to access to the courts will be accorded special constitutional protection only where the right sought to be asserted through such access is a right recognized in the constitutional sense as carrying a preferred status and so entitled to special protection and then only where there is no alternative forum in which vindication of that constitutionally protected right may be sought. In Boddie, the court found that access to the courts was "the exclusive precondition to the adjustment of a fundamental human relationship” (p 383)— that of marriage—and concluded that a State may not "preempt the right to dissolve this legal relationship without affording all citizens access to the means it has prescribed for doing so” (p 383). By contrast the Supreme Court has held that access to the courts for the resolution of other claims (involving rights not subject to special constitutional protection) may be denied if there is a rational basis therefor; no proof is required of any compelling State interest or that the legislative choice of means of accomplishment was the least restrictive. (Ortwein v Schwab, 410 US 656, supra [$25 filing fee which operated to deprive appellants of opportunity to obtain appellate review of agency determination reducing welfare benefits]; United States v Kras, 409 US 434, supra [filing fee as precondition to petition court for discharge in bankruptcy].)
*61 Article 18 in denying to plaintiffs the right to seek recovery for some of their injuries "in the courts” does not affect any right which has been recognized as entitled to special constitutional protection. Moreover, article 18 provides to plaintiffs an alternative method of recovering for such injuries at least to the extent of economic damages.
Conceptualized differently, article 18 denies no one access to the courts; it merely alters the substantive law, partially eliminating the right of an automobile accident victim to judicial recovery for injuries suffered.
There is here then no occasion to apply the strict scrutiny standard of review. Nor, indeed, is there any occasion to determine the details of the standard for testing constitutionality where the right sought to be vindicated might be found to call for a test somewhere along the sliding scale between strict scrutiny at one end and rational basis at the other (cf. San Antonio School Dist. v Rodriguez, 411 US 1, 70-135 [dissenting opn of Mr. Justice Makshall]; Vlandis v Kline, 412 US 441, 458 [concurring opn of Mr. Justice White]; Jimenez v Weinberger, 417 US 628, 632; Stanton v Stanton, 421 US 7; see Gunther, The Supreme Court, 1971 Term— Forward: In Search of Evolving Doctrine on a Changing Court —A Model for a Newer Equal Protection, 86 Harv L Rev 1). We here apply the traditional equal protection test as expressed in Dandridge v Williams (397 US 471, 485): "In the area of economics and social welfare, a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect. If the classification has some reasonable basis, it does not offend the Constitution simply because the classification 'is not made with mathematical nicety or because in practice it results in some inequality.’ ” The decisions of our court have adopted the same test. (Gleason v Gleason, 26 NY2d 28, 41; Bauch v City of New York, 21 NY2d 559, 607, cert den 393 US 834; Bucho Holding Co. v Temporary State Housing Rent Comm., 11 NY2d 469, 477.) Thus it becomes apparent that the scrutiny to be applied to plaintiffs’ equal protection claims here is similar to that which we have applied to the claims which they ground in due process, and many of the considerations and conclusions which there obtained are equally applicable here.
Plaintiffs first contend that the operation of section 673 creates an arbitrary and capricious classification as between covered and noncovered persons. Subdivision 1 of that section *62 bars a suit in tort in actions between covered persons unless the injured party sustains a serious injury or incurs expenses in excess of basic economic loss. Under subdivision 2 of that section, however, no such bar attaches where a noncovered person is a party to the suit. Noncovered persons under article 18 include: (1) an owner, operator or passenger on a motorcycle (§671, subd 6, par [b]); (2) the owner, operator or occupant of an uninsured motor vehicle (§ 671, subds 9, 10); and (3) the owner or operator of an out-of-State motor vehicle whose insurance policy does not include no-fault coverage for New York operation (§ 676). Plaintiffs claim that there can be no rational basis for a scheme which determines whether a right to recover in tort exists by reference to the identity of the motorist involved. Such a claim does not withstand analysis.
There was a rational basis for the exclusion of motorcycles from the definition of motor vehicle. The Legislature had before it evidence that the premium cost to motorcyclists, should they have been required to purchase first-party coverage under the no-fault plan, would have been prohibitively high. (See statement of David S. Kaplan, President of the National Motorcycle Plan, Inc., before the Joint Legislative Committee on Insurance Rates, Regulation and Recodification of the Insurance Law [March 3, 1972]; 1972 NY Legis Doc No. 21, p 17.) As one of the legislative purposes in enacting a no-fault plan was to reduce the cost of premium insurance, exclusion of motorcycles was certainly rationally related to that purpose.[16] Additionally we note that in enacting reform, the Legislature is entitled to proceed "one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind”. (Williamson v Lee Opt. Co., 348 US 483, 489; Silver v Silver, 280 US 117, 123, supra.)
Similarly it was not unreasonable for the Legislature to have excluded persons operating uninsured vehicles from coverage under article 18. Such persons operate their vehicles in violation of the law of our State (Vehicle and Traffic Law, arts 6, 8) and further make no contribution to the automobile injury compensation system designed to spread the risk of loss among all who drive.
Finally with respect to this contention, we find no infirmity *63 in the exclusion from coverage of an out-of-State motor vehicle whose insurance policy does not include no-fault coverage for operation in our State. Certainly the Legislature cannot be faulted for not extending the requirement of coverage to those over whom the Legislature had no power to act.[17] Rather than representing an arbitrary and capricious exercise of legislative power, this exclusion merely recognizes the realities of the situation. Additionally we note that the number of persons excluded from coverage under section 676 is minuscule.[18] The classification having a reasonable basis, "it does not offend the Constitution simply because [it] 'is not made with mathematical nicety or because in practice it results, in some inequality’ ”. (Dandridge v Williams, 397 US 471, 485, supra.)
Still urging their claim of denial of equal protection plaintiffs next challenge the legislative definition of "serious injury” (§ 671, subd 4) by which it is determined whether or not a party shall or shall not have a right to sue for pain and suffering (§ 673), as creating an arbitrary and capricious classification. Serious injury is defined to mean a personal injury:
"(a) which results in death; dismemberment; significant disfigurement; a compound or comminuted fracture; or permanent loss of use of a body organ, member, function, or system; or
*64 "(b) if the reasonable and customary charges for medical, hospital, surgical, nursing, dental, ambulance, x-ray, prescription drug and prosthetic services necessarily performed as a result of the injury would exceed five hundred dollars.”
Plaintiffs argue that certain injuries such as a simple fracture to the skull or vertebrae, while not included within the statutory list of serious injuries, are capable of producing pain and suffering to a far greater degree than other injuries such as comminuted fractures to the little fingers which the Legislature did include in the list. Plaintiffs further argue that the $500 threshold amount is not related to any rational basis.[19]
We have already expressed our views as to the reasonableness of the Legislature’s conclusion that the tort system of recovery for nonserious injuries resulting in minimal economic losses was beset with deficiencies and inequities which were within the Legislature’s power to address. Having therefore decided to limit tort recovery to pain and suffering associated with serious injury, the Legislature was confronted with the problem of establishing a line of demarcation between serious and nonserious injury and between large and small claims—a line which would be marked by rules easily and readily applied to avoid the expenditure of time and money in investigation and determination on which side of the line each particular claim would fall.
We find the classifications created by the Legislature to be reasonably related to the end of establishing a rational line of distinction and of eliminating the evils which that body perceived to exist. True it may be that certain injuries not listed might well have been included within the class of serious injuries or that the threshold amount might more wisely have been set at $400 or $600. But such decisions are not of determinative concern to this court. "[EJvery line drawn by a legislature leaves out some that might well have been included. That exercise of discretion, however, is a legislative, not a judicial, function.” (Village of Belle Terre v Boraas, 416 US 1, 8; and see Metropolis Theatre Co. v Chicago, 228 US 61, *65 69-70; Bucho Holding Co. v Temporary State Housing Comm., 11 NY2d 469, supra; People v Friedman, 302 NY 75, 80, app dsmd 341 US 907.) These principles were given expression in the words of Mr. Justice Holmes in Louisville Gas Co. v Coleman (277 US 32, 41) wherein he stated: "When a legal distinction is determined, as no one doubts that it may be, between night and day, childhood and maturity, or any other extremes, a point has to be fixed or a line has to be drawn, or gradually picked out by successive decisions, to mark where the change takes place. Looked at by itself without regard to the necessity behind it the line or point seems arbitrary. It might as well or nearly as well be a little more to one side or the other. But when it is seen that a line or point there must be, and that there is no mathematical or logical way of fixing it precisely, the decision of the legislature must be accepted unless we can say that it is very wide of any reasonable mark.”
Nor can we accept plaintiffs’ contention that it was irrational to base the computation of the $500 amount on treatment expenses alone rather than on "basic economic loss”. To have utilized the latter standard would clearly have been to favor those in higher earned income brackets.
Plaintiffs’ attack on the $500 threshold amount on the grounds that particular charges for medical services vary from one locality to another and in operation might discriminate against the poor is not persuasive.[20] Section 671 (subd 4, par [b]) provides that the threshold requirement is met when it is determined that "reasonable and customary” charges would exceed $500. We note the difference in diction employed by the Legislature in different provisions of article 18. The standard for proof of a claimant’s basic economic loss is "all reasonable and necessary expenses incurred”, i.e., an individualized standard related to the expenses in fact incurred by the particular plaintiff (§ 671, subd 1, par [a]). The standard for determination of the threshold amount, by contrast, is "the *66 reasonable and customary charges for * * * services necessarily performed” (§671, subd 4, par [b]; italics supplied), a general standard in the application of which payments actually made by the particular claimant will not be determinative. The argument that an absolute $500 threshold will work a denial of equal protection because medical and hospital charges are relative, varying from community to community (an argument equally applicable to any dollar amount which our Legislature might have fixed) proceeds on the fallacious assumption again that the legislative standard must be made with "mathematical nicety” and in practice result in no "inequity” (Dandridge v Williams, 397 US 471, 485 supra). Dispute as to what is "reasonable and customary” is a question of fact not dissimilar to many issues of damages which can be and are effectively determined by a jury or Judge without a jury. (See, e.g., Morell v Vargas, 83 Misc 2d 30, wherein a complaint was dismissed on a jury finding that the plaintiff had not incurred "reasonable and customary charges” over $500 despite uncontradicted proof of actual medical expenditure of $927.)

Right to a Jury Trial

Finally plaintiffs argue that article 18, in limiting their right to recover in tort, infringes on their right to trial by jury, protected by section 2 of article I of our State Constitution.[21] This argument is similar to the claim discussed (supra, p 60) that article 18 infringes on plaintiffs’ right of "access to the courts”. The argument is no more tenable in its new guise.[22]
Article 18 does not replace the jury as trier of fact with some other trier of fact. Rather it modifies the substantive law and redefines the rights of those personally injured in automobile accidents. The Constitution guarantees the right to trial by jury if the plaintiff has a claim to assert. If, as here, the Legislature otherwise properly abrogates the claim in part, to *67 that extent there remains nothing to which the right to trial by jury may attach. (Cf. Hanfgarn v Mark, 274 NY 22, 26, supra.)
The United States Supreme Court, in interpreting the proscription of the Seventh Amendment of the Federal Constitution (preserving the right to trial by jury in language similar to that of our State Constitution), reached the same conclusion as that which we reach. (Mountain Timber Co. v Washington, 243 US 219.) In that case the court considered challenges made under the Seventh Amendment to the enactment of a workmen’s compensation law abrogating an employee’s right at common law to recover in negligence from his employer. In rejecting the challenge, that court stated: "We find nothing in the act that excludes a trial by jury. As between employee and employer, the act abolished all right of recovery in ordinary cases, and therefore leaves nothing to be tried by jury”. (243 US, at p 235; see, also, New York Cent. R. R. Co. v White, 243 US 188, 201; Arizona Employers’ Liab. Cases, 250 US 400, 421, 430-431.)
Plaintiffs’ argument that where a cause of action triable by jury exists today, the Legislature can do nothing tomorrow to limit or to abolish that cause of action, carried to its logical extension, would seriously handicap the Legislature in carrying out its most basic function—"to remedy defects in the common law as they are developed, and to adapt it to the changes of time and circumstances” (Munn v Illinois, 94 US 113, 134 supra; cf. NY Const, art I, § 14). We are obliged to reject this argument. "A decision to the contrary, if carried to its logical conclusion, would result in a stagnation of law and be directly in conflict with many decisions of this court.” (Hanfgarn v Mark, 274 NY 22, 26, supra.)
We find no merit to the extended argument advanced by plaintiffs based on what the Court of Appeals decided and wrote nearly 65 years ago in Ives v South Buffalo Ry. Co. (201 NY 271) and on the consequent amendment of our State Constitution to authorize enactment of workmen’s compensation laws. In our view Ives would not be similarly decided by our court today. The doctrine of substantive due process with which the Ives opinion is pregnant was relegated to obscurity in Nebbia v New York (291 US 502). Jurisprudence has marched many strides in the intervening years. Reliance on Ives is misplaced.
Finally we conclude that there is no merit to plaintiffs’ *68 contention that even if it be assumed that total abolition of a common-law cause of action would not violate section 2 of article I, because nothing would be left for a jury to try, a different result should follow when as here there has been only a partial abrogation of a common-law cause of action. Again, pro tanto, there is nothing left for a jury to try.
The judgment of Supreme Court should be reversed, summary judgment granted to defendants, and the case remitted to Supreme Court for a declaration consistent with the views expressed in this opinion.

. For a brief history of the development of the concept of no-fault insurance see Shmermer, Automobile Liability Insurance—No Fault Insurance, Uninsured Motorists, Compulsory Coverage (§ 1.01).

. We find three such studies particularly helpful in their marshaling of statistical evidence: the oft-cited study prepared by Professors Keeton and O’Connell in 1965 in which was proposed a scheme encompassing no-fault protection in conjunction with the preservation of tort liability for major injuries (Keeton and O’Connell, Basic Protection for the Trafile Victim [Keeton and O’Connell]); a report by the New York State Department of Insurance published in 1970 and entitled, Automobile Insurance . . . For Whose Benefit? [Insurance Department Report]; a 1971 report by the United States Department of Transportation prepared at the request of Congress and entitled, Motor Vehicle Crash Losses and Their Compensation in the United States [DOT Report]).
We, of course, express no judicial view as to the conclusions reached by any of these *50 studies for, in determining whether or not the Legislature’s response to this issue was constitutionally permissible, it is not within the judiciary’s province to pass on the wisdom, propriety or even correctness of that legislative response. (People v Broadie, 37 NY2d 100, 117-118; James v Strange, 407 US 128, 133.)

. See, generally, then Governor Rockefeller’s Memorandum approving the act, NY Legis Ann., 1973, p 298.

. The Insurance Department Report added (at p 48, n 96): "Now we can fully appreciate the absurdity of the notion that the fault insurance system is a 'deterrent’ to bad driving. Earlier we saw that, taken just as a theoretical proposition, the notion of insured civil liability as a deterrent to unsafe conduct was not plausible * * * The notion is a vestige of old thinking about fault law, before liability insurance. Now over 99% of New York cars are insured * * * and all that is possibly left of the 'deterrence’ argument under the fault insurance system is that insurance company underwriting and rating practices will cause the bad drivers to be denied insurance, to have their insurance cancelled or to have their rates go up. Even in this attenuated form the argument is without substance. It has, in effect, been overwhelmed by the very steps society has taken to expand compensation to victims, or to protect consumers against harsh actions by insurers. Insurers cannot cancel policies for accident involvement, even if the policyholder was adjudged at fault. People who cannot get insurance in the normal market can obtain it through the assigned risk plan, again without regard to fault. Rate differentials, being matters of prediction and not recoupment, vary according to many factors (such as place of residence, age and car use) that have nothing to do with the individual policyholder’s driving record.”

. It was concluded in the Insurance Department Report (at p 27) that 33% of the victims with small economic losses recovered one and one half of their economic losses and only 18% did not receive as much as three quarters of their economic losses. On the other hand, of those victims studied who incurred the largest economic losses, not one received three quarters of his economic loss and 71% recovered one quarter or less of such loss.
The DOT Report (at pp 94-95) found: “For those whose economic losses were more than $25,000, only about a third was usually recovered. Those with relatively small economic losses, by contrast, fared much better; if they recovered from tort and had losses less than $500, their recovery averaged four and a half times actual economic loss.”

. The Insurance Department Report (at pp 19-20) found that the average claim-to-payment interval for automobile personal injury was 15.8 months, or 10 times as long as the interval for automobile collision, homeowners or burglary insurance and 40 times as long as the interval for accident and health insurance. In addition, 17% of total claims which remained unpaid after two years represented 45% of the total dollar loss. (And see DOT Report, at pp 41-42; Keeton and O’Connell, at pp 46-49.)

. A summary of the extensive legislative debate preceding passage of the act is contained in the Report of the Joint Legislative Committee on Insurance Rates, Regulation and Recodification of the Insurance Law, NY Legis Doc, 1973, No. 18, pp 8-14.

. See Conn Gen Stat Ann., §§ 38-319-38-351a (eff Jan., 1973); Del Code Ann., tit 21, § 2118 (eff Jan., 1972); Fla Stat Ann., §§ 627.730-627.741 (eff Jan., 1972); Kan Stat Ann., §§ 40-3101-40-3121 (eff Jan., 1974); Md Ann. Code, art 48A, §§ 538-546 (eff Jan., 1973); Mass Gen Laws Ann., ch 90, § 34M; ch 175, § 113B; ch 231, § 6D (eff Jan., 1971); Mich Comp Laws Ann., §§ 500.3101-500.3179 (eff Oct., 1973); NJ Stat Ann., §§ 39:6A-l-39:6A-20 (eff Jan., 1973); Ore Rev Stat, §§ 743.800-743.835 (eff Jan., 1972); SD Comp Laws Ann., §§ 58-23-6-58-23-8 (eff Jan., 1972); Tex Ins Code Ann., art 5.06-3 (eff Aug., 1973); Utah Code Ann., §§ 31-41-1-31-41-13 (eff Jan., 1974); Va Code, §§ 38.1-380.1-38.1-380.2 (eff July, 1972).
No-fault laws have become effective in 10 States since February 1, 1974. See Ark Stat Ann., §§ 66-4014-66-4021 (eff July 1, 1974); Col Rev Stat, §§ 10-4-701-10-4-723 (eff April 1, 1974); Ga Code Ann., §§ 56-3402b-56-3413b (eff March 1, 1975); Hawaii Rev Stat, §§ 294-1- 294-41 (eff Sept. 1, 1974); Ky Rev Stat, §§ 304.39-010-304.39-340 and 304.99-050 (eff July 1, 1975); Minn L 1974, ch 408; Minn Stat Ann., § 65B.41-65B.71 (eff Jan. 1, 1975); Nev Rev Stat, §§ 698.010-698.510 (eff Feb., 1974); ND L 1974, ch 265 (eff Jan. 1, 1976); Pa Stat Ann., tit 40, §§ 1009.101-1009.701 (eff July 19, 1975); SC Code, §§ 46-750.101-46-750.154 (eff Oct. 1, 1974).

. In the following cases, in what must be recognized as at least partially distinguishable legal contexts, the legislation was sustained in its entirety: Pinnick v Cleary, 360 Mass 1; Opinion of The Justices, 113 NH 205; Manzanares v Bell, 214 Kan 589; Singer v Sheppard, 346 A2d 897 (Pa, 1975); Fann v McGuffy, 534 SW2d 770 (Ky, 1975); Gentile v Altermatt, — Conn — (Aug. 5, 1975). In Lasky v State Farm Ins. Co. (296 So 2d 9 [Fla, 1974]), the Supreme Court of Florida, while finding portions of the no-fault statute before it unconstitutional, severed such portions and found the bulk of the statute constitutional. The Illinois Supreme Court is the only State court of last resort to invalidate in its entirety a no-fault law. (Grace v Howlett, 51 111 2d 478.) That case is entirely distinguishable from the case here under consideration *53 both as to the Illinois statute under review and as to the controlling provisions of the Illinois State Constitution.

. (See, e.g., Nault v Smith, 194 Cal App 2d 257; Hardwick v Bublitz, 253 Iowa 49; Shea v Olson, 185 Wash 143; Perozzi v Gariere, 149 Ore 330; Naudzius v Lahr, 253 Mich 216; and see Silver v Silver, 280 US 117, supra.)

. (See, e.g., Langdon v Sayre, 74 Cal App 2d 41; Thibault v Lalumiere, 318 Mass 72; Hanfgarn v Mark, 274 NY 22, remittitur amd 274 NY 570, app dsmd 302 US 641; Pennington v Stewart, 212 Ind 553.)

. The Massachusetts Supreme Court adopted the same approach—without reaching "the difficult question of when the Legislature may abrogate a common law right of recovery without providing a substitute remedy”, the court found the no-fault law before it to have provided such a substitute remedy. (Pinnick v Cleary, 360 Mass 1, 15, supra.) Other courts of last resort which have found no-fault plans similar to article 18 to be adequate substitutes for the tort systems which they replaced include Florida (Lasky v State Farm Ins. Co., 296 So 2d 9 [Fla], supra); Kansas (Manzanares v Bell, 214 Kan 589, 599); New Hampshire (Opinion of the Justices, 113 NH 205, 212), and Connecticut (Gentile v Altermatt, — Conn —, — [Aug. 5, 1975], supra).

. The Michigan Supreme Court in an advisory opinion perceived no defect of vagueness in the use of the term "permanent serious disfigurement” in Michigan’s no-fault law. The court found the phrase "sufficient for legal interpretation”, observing that "juries or judges sitting without juries frequehtly have and do interpret comparable phrases bearing upon various facets of the law.” (Matter of Constitutionality of 1972 PA 294, 389 Mich 441, 447.)

. For a discussion of the scope and applicability of the strict scrutiny standard of review, see the dissenting opinion in Matter of Malpica-Orsini (36 NY2d 568, 581-583).

. We note that in no case decided by a court of last resort reviewing the constitutionality of a no-fault law was an equal protection claim reviewed under the strict scrutiny standard of review. In at least four instances such courts expressly rejected arguments made to them that strict scrutiny constituted the appropriate test. (See Pinnick v Cleary, 360 Mass 1, supra; Opinion of the Justices, 113 NH 205, supra; Lasky v State Farm Ins. Co., 296 So 2d 9 [Fla], supra; Manzanares v Bell, 214 Kan 589, supra.)

. At least three other State courts of last resort have sustained the exclusion of motorcycles from no-fault coverage (Lasky v State Farm Ins. Co., 296 So 2d 9 [Fla], supra; Manzanares v Bell, 214 Kan 589, supra; Singer v Sheppard, 346 A2d 897 [Pa], supra).

. To the extent of its power, the Legislature acted to guarantee that nonresident motorists do not fall within the noncovered class. Articles 6 and 8 of the Vehicle and Traffic Law require that nonresident motorists carry no-fault coverage for their excursions into New York. Furthermore section 676 of the Insurance Law requires all insurers (i) licensed in New York, (ii) controlled by an insurer licensed in New York, or (iii) controlled by a holding company affiliated with a New York licensed insurer, to provide New York no-fault coverage when a vehicle they cover happens to be driven in New York. In addition, the Insurance Department requested insurers not licensed in New York voluntarily to provide New York no-fault coverage to their policy holders. Of the 524 such insurers contacted over 85% had agreed to do so as of May, 1974. (New York Insurance Department, 115 Annual Report of the Superintendent of Insurance to the New York State Legislature for 1973, at p 19.)

. The Attorney-General has provided the following pertinent statistics: The 69 insurers having no contact with New York who "either declined to provide no-fault coverage for their insureds while driving in this State or neglected to respond to the State Insurance Department’s request [see n 17, supra] * * * write less than 1% of total United States and Canadian automobile premiums of over 12 billion dollars. Moreover, fewer than 5% of all New York auto personal injuries involve out-of-state drivers (State Dept. of Motor V., 1973 Annual Rept. at 21). Hence, the possibility that any accident may involve such a non-covered person is less than Via of 1%. This minuscule probability is diluted further, since the 69 small carriers (save four in Quebec and Ontario) are located in non-contiguous states.”

. It is notable that all of the State courts of last resort have upheld monetary thresholds computed with respect to medical or treatment expenses (Gentile v Altermatt, — Conn — [1975], supra [$400];. Lasky v State Farm Ins. Co., 296 So 2d 9 [Fla], supra [$1,000]; Manzanares v Bell, 214 Kan 589, supra [$500]; Fann v McGuffey, 534 SW2d 770 [Ky], supra [$1,000]; Pinnick v Cleary, 360 Mass 1, supra [$500]; Opinion of the Justices, 113 NH 205, supra [$1,000]; Singer v Sheppard, 346 A2d 897 [Pa], supra [$750]).

. We note in passing that there were findings before the Legislature that the tort system worked particularly to the disadvantage of people who were poor and uneducated. The United States Department of Transportation found that where family income was $10,000 or more accident victims recovered 61% of their economic loss, but where it was below $5,000 they recovered only 38% of their economic loss. (US Dept of Transportation, Economic Consequences of Automobile Accident Injuries, p 54 [1970].) Likewise it was shown that seriously injured victims with postgraduate education recovered 73% of their economic loss while those with only five to eight years of formal education recovered only 27 % of their economic loss. (Id., at p 52.)

. Section 2 of article I provides in pertinent part: "Trial by jury in all cases in which it has heretofore been guaranteed by constitutional provision shall remain inviolate forever”.

. In distinguishable contexts, the highest courts of other States have rejected similar denial-of-right-to-trial-by-jury challenges to no-fault plans (Gentile v Altermatt, — Conn — [1975], supra; Lasky v State Farm Ins. Co., 296 So 2d 9 [Fla], supra; Manzanares v Bell, 214 Kan 589, 616, supra; Pinnick v Cleary, 360 Mass 1, supra; Opinion of the Justices, 113 NH 205, 211, supra).