OPINION OF THE COURT
Harold Hyman, J.
The issue in this case is one of first impression. The novelty of the issue presented to the court herein, upon an agreed statement of facts, is whether by reason of the application of our "no-fault” statutes (Insurance Law, § 672; art 18) plaintiffs are entitled to a windfall, that is, in addition to payment under no-fault, are they entitled to duplicate such receipt of payment under defendant’s Union Welfare Fund. The agreed upon facts relevant to the issue involved are as follows:
Union Local 202, I.B.T. is an organized labor union in which plaintiff, Frederick Hunacek, is a member in good standing. He was also a member in good standing on January 17, 1978; plaintiff, Gerri Hunacek, was on said date, the wife of plaintiff Frederick Hunacek; defendant afforded to its members and their dependents on said date certain benefits which are specifically enumerated in the welfare fund booklet entitled "Your Welfare Fund Benefit Program.”
On January 17, 1978 plaintiff, Gerri Hunacek, was involved in a motor vehicle accident and incurred certain expenses which were covered by a policy of "no-fault” insurance issued by Nationwide Insurance Company; said insurance company *741 paid said charges or is responsible for their payment; plaintiffs also seek payment of such health care items from the Union Welfare Fund Benefit Program, the effect of which would result in plaintiffs receiving "double payment”, a windfall.
It is the plaintiffs’ contention that the payment of "no-fault benefits”, pursuant to a separate policy of insurance, does not preclude recovery pursuant to the coverage afforded by the defendant Welfare Fund (hereinafter Fund). This contention is not unfounded in principle inasmuch as where the injured party has been wholly or partly indemnified for his loss by insurance his recovery is not diminished by reason of this collateral source. (Healy v Rennert, 9 NY2d 202, 206.) Hence, the plaintiffs cite cases to support their claim for duplicate payments.
In Rubin v Empire Mut. Ins. Co. (25 NY2d 426), the Court of Appeals held that an insured under an automobile liability policy is entitled to receive payment of the amount of his medical expenses under a medical expense indorsement in the policy despite the fact that such expenses were satisfied out of workers’ compensation payments. Likewise, in a recent case decided by this court (Greenspan v Travelers Ins. Co., 98 Misc 2d 43), it was held that satisfaction of medical expenses incurred by payment obtained through some third party would not militate against recovery under a group accident and sickness policy providing for major medical coverage.
However, a careful review of the above decisions indicates certain specific underlying circumstances for their allowing duplicate payments therein. The court in Rubin (supra, pp 429-430) reinforced its result by quoting the following language from a text on insurance law in which the author analyzing the nature of the medical expense indorsement in automobile liability policies states: “ 'Since such expense payments are in the nature of health insurance, and payments under such policies are considered to be merely a return of premiums, duplicate payments ordinarily may be secured. * * *’ (8 Appelman, Insurance Law and Practice, § 4896, p 351.)” In Greenspan (supra) decided by this court, the defendant insurer contended that the claimant did not "actually incur” such expense because eventually another source remunerated the primary source for the "expense incurred” in the supplying of blood for the claimant’s decedent during his last illness. That case hinged upon a claimed, but unfounded, distinction in the language of the policy prepared by defen *742 dant and defendant’s failure to insert any limitation, exclusion, or distinction in said verbiage. Thus, the reasoning behind both decisions is that, crucial to any final determination is an evaluation of the language used in the policy or agreement involved and the purposes and scope of their application to the issue of "double payment”.
The Union Welfare Fund Local 202, was created on October 1, 1977 by Union Local 202, I.B.T. and various contributing "employers”. It is noncontributing in its application to "employees”. The purpose of the Fund is to provide health and welfare benefits for employees covered by collective bargaining agreements between those "employers and the Local Union.” The nature of the benefits offered brings this Fund within the definition of an "Employee Welfare Benefit Plan” provided for and within the Federal Employee Retirement Income Security Act of 1974 (ERISA) (US Code, tit 29, § 1001 et seq.). ERISA is designed to protect the interests of employees and their beneficiaries in the private sector by regulating the participation, funding, vesting, reporting, administering, as well as other aspects of such plans. As stated, the clear intention of ERISA was to provide Federal regulation of the field of employee benefit plans (Azzaro v Harnett, 414 F Supp 473, affd 553 F2d 93, cert den 434 US 824), with the purpose to provide minimum standards " 'assuring the equitable character of such plans and their financial soundness’ (US Code, tit 29, § 1001, subd [a]) * * * [and] to protect 'the interests of participants in employee benefit plans and their beneficiaries * * * by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, and ready access to the Federal courts’ (§ 1001, subd [b]).” (National Bank of North Amer. v International Brotherhood of Elec. Workers Local 3, 69 AD2d 679, 684.) As stated in National Bank of North Amer. v International Brotherhood of Elec. Workers Local 3 (69 AD2d 679, 684, supra): "It is clear from the foregoing and from an examination of the history of ERISA that its purpose was to protect the beneficiaries of the funds from mismanagement of those funds by the fiduciaries of the plans. By enacting ERISA Congress sought to correct the pattern of wasting and looting which had resulted in a devasting denial of benefits to the intended recipients of the plans. * * * 'Congress found also that, due to mismanagement, "employees and their beneficiaries have been deprived of anticipated benefits.” ’ ”
*743 To show and provide without equivocation, that there be a distinct and different relationship of such plans than as to insurance agreements, the Federal act explicitly provides for exclusive Federal jurisdiction in this area and removes from all doubt that these plans, or any trusts established thereunder, shall not be deemed to be engaged in the business of insurance and thereby subject to State insurance regulatory provisions (ERISA, § 514, subd [b], par [2], cl [B] [US Code, tit 29, § 1144, subd (b), par (2), cl (B)]).
These "employee benefit plans” are distinguished from the concept of "insurance” based on the premise that they are nonprofit, nonadvertising and nothing more than incidents of the employment contract by which the employer hopes to get better services from its employees. (Bell v Employee Security Benefit Assn., 437 F Supp 382, 390.) Moreover, noninsured programs are further distinguished by the total absence of insurance. (Duesenberg, The Legality of Noninsured Employee Benefit Programs, 5 BC Ind & Com L Rev 231, 238-240.)
This Fund is a "noninsured” program. No assets of the Fund consist of insurance contracts or policies issued by an insurance company for the payment of claims. It is funded solely by employers’ contributions. In accordance with the statutory mandate, these contributions which make up the assets of this benefit plan "shall be held in trust by one or more trustees.” (ERISA, § 403, subd [a] [US Code, tit 29, § 1103, subd (a)]). Those trustees named in the welfare fund booklet have exclusive authority and discretion to manage and control the assets of the Fund, they serve as fiduciaries obligated to discharge their duties in the sole interest of the plan participants and beneficiaries and "in accordance with the documents and instruments governing the plan” (ERISA, § 404, subd [a], par [1], cl [D] [US Code, § 1104, subd (a), par (1), cl (D)]). This high standard of performance demanded of a benefit plan trustee, as opposed to that of the profit-motivated insurer, serves to highlight still another distinction between these plans and the insurance concept.
However, not unlike an insurance policy, the extent of coverage provided by the Fund can only be gleaned from a review of the governing document. The relevant provisions of the welfare fund booklet read in part as follows (portions thereof have been emphasized to indicate the purpose and intent of the plan):
" 'Duplicate Coverage Limitation’
*744 “If all or any part of incurred charges are payable as the result of other insurance coverage or by any other benefit plan, this Fund will pay only such costs, within the limitations of this Plan, which are in excess of those payable by such other carrier or plan.

“ 'Coordination With Other Benefits’

"This Plan has been designed to help you meet the cost of disease or injury. Since it is not intended that you receive greater benefits than the actual medical expenses incurred, the amount of benefits payable under this Plan will take into account any coverage you, your spouse, or dependents have under other group plans; that is, the benefits under this Plan will be coordinated with the benefits of the other group plans * * *
"2. If your spouse or child is covered by such a group coverage plan then that plan has first responsibility and must pay all expenses incurred up to the limit of the schedules in that plan. However, if the plan covering your spouse or child does not provide enough coverage to pay all of the expenses incurred, then our Fund will pay the uncovered expenses within the limits of our own schedules. In other words, you cannot collect full coverage under your spouse’s plan and then collect the same full coverage from our Fund. This would be unfair to other members and would reduce the amount of benefits our Fund can provide for all coverages.

“fThe Following Expenses Are Not Eligible’

"7. Expenses for services, treatments and supplies provided for the eligible individual under any other insurance coverage or by any other benefit plan, or under a plan or law of any government or political subdivision. This Fund will pay only such costs, within the limitations of this Plan, which are in excess of those payable by such other carrier or plan.”
The defendant maintains that these provisions clearly convey the intention of the plan, to wit: to preserve assets of the Fund for the benefit of all participants by avoiding duplication of coverage; such would be within the ERISA intent, purposes and statutes. In response, the plaintiffs take issue with the application of the provision entitled "Coordination With Other Benefits” since the attempt therein is to co-ordinate defendant’s coverage with that of other group coverages and not the type of individual coverage provided by "no-fault”. The court believes otherwise. Those provisions surely serve to clearly, definitively and unequivocally communicate the intention of *745 the plan not to allow participants or beneficiaries to receive greater benefits than the actual medical expenses incurred. Clearly this is an intent to prevent a recovery more than is necessary to make one whole. Further, in paragraph 2 of that provision, it is again expressed to be the intent that the amount of benefits the Fund can provide for all coverages to other members must be protected by co-ordinating these benefits; thus a definitive fiduciary instruction to prevent waste.
Analogous to the intention set forth is that found in the area of insurance, where it is not uncommon to find provisos in group insurance policies limiting or reducing the coverage where the loss incurred is payable from other sources as those mentioned in the co-ordination of benefits clause under consideration here. Generally, those provisions are enforced by the courts, for example, to prevent the insured from recovering more than is necessary to make him whole (see Dina v Aetna Life Ins. Co., 65 Misc 2d 97, 99).
Although the co-ordination clause is in fact limited to the group plan situation, no such circumscription may be found in other provisions. Both make reference to the satisfaction of "incurred charges” by "other insurance coverage” among other forms of coverage. This language often used by insurers, is to effect an escape from liability or limit their liability to that of pro rata or excess insurers (Wyman v Allstate Ins. Co., 29 AD2d 319, 324). Plaintiffs argue that this language is broad, general terminology which cannot be enlarged by defendant to include no-fault coverage; that, if this were the defendant’s intention, there should have been specific exclusion of no-fault; and that the ambiguity in the phrase — "any other insurance” — must be construed against the defendant. This court disagrees that no-fault warrants such special treatment since no ambiguity is perceived in the plan coverage taken as a whole, and particularly in the terminology "any other insurance”. More likely than not, there would be a presumption that this includes no-fault coverage inasmuch as that coverage is mandated by this State. (Insurance Law, § 672, subd 1; Montgomery v Daniels, 38 NY2d 41, 46.)
Speaking of "no-fault” coverage, it has been interpreted to mean "the requirement that every owner of a motor vehicle provide himself, members of his household, operators, occupants and pedestrians with compensation for 'basic economic loss’ resulting from injuries occasioned by the use or occupation of that motor vehicle in this State, regardless of fault” *746 (Montgomery v Daniels, 38 NY2d 41, 46, supra; Insurance Law, art 18; § 672, subd 1) subject to certain specifically provided exceptions which may be excluded by the insurer in its policy (Insurance Law, art 18; § 672, subd 2); but, except as to such specific exclusions, "The right to first-party benefits accrues to the injured person regardless of fault or negligence” (Montgomery v Daniels, supra, p 47); the injured person is thus a direct primary beneficiary under the terms of the policy paid for by the vehicle owner.
In addition, with respect to the strict construction requested by the plaintiffs, even if the "strict construction rule” from the insurance arena were to be applied to the coverage provided by the defendant, the law has not held the rule to be inflexible. Thus, it is stated in Wyman (supra, pp 322-323), "The rule requiring strict construction against an insurer is not one which compels a construction against an insurer merely because it is a possible construction and strict in effect.”
Here, the trustees have direction to follow the true purpose of the plan, one looked upon with most and just favor by a well-meaning United States Congress in its own ERISA legislative enactment. The direction was one clearly to prevent only few beneficiaries receiving such great amount of funds from the plan as would bankrupt it to the detriment of other future named beneficiaries. Waste can take the form of "double payment”; and it is to prevent such that this plan provides for "excess payment” to make a beneficiary "whole” not to allow for any one beneficiary receiving an unwarranted "windfall”.
ERISA further unequivocally admonishes that the plan being governed by Federal legislation shall not be deemed controlled or governed by State insurance regulation (US Code, tit 29, § 1144, subd [b], par [2], cl [B]), and it is thusly distinguishable in that it is to be interpreted under contract law and thusly to be given effect as to its unambiguous provisions.
In so construing the plan, as it applies to no-fault payments or provisions, the court finds that there is no ambiguity in the provisions of said plan which in any way can be construed to provide for plaintiffs recovering more than an "excess” as therein provided, and this is consistent with public policy (Blue Cross of Northeastern N. Y. v Ayotte, 35 AD2d 258; *747 Silinsky v State-Wide Ins. Co., 30 AD2d 1; Dudley v Blue Cross, 63 AD2d 813).
The complaint is dismissed on the merits, with costs and disbursements.