OPINION OF THE COURT
Thomas E. Mercure, J.
In the within proceeding pursuant to CPLR article 78, petitioners seek to annul a September 1,1983 determination of the respondent Adirondack Park Agency (hereafter referred to as the APA or the agency) granting the respondent project sponsors, Barry Silverstein and Twin Ponds Associates (hereafter referred to in the aggregate as the sponsor) a permit to create a 49-lot subdivision on a 406 ± acre parcel of land situate on the east side of New York State Route 30 in the Town of Duane, Franklin County, New York.
In support of the petition, petitioners contend: (1) that the subject application involved more than 50 lots and that, accordingly, the director of operations of the APA lacked authority to review the application and grant the permit; (2) that the said director of operations lacked authority to deny petitioners’ request for a public hearing on the application, and the determination of the APA not to conduct a public hearing was based on inadequate consideration of necessary criteria; (3) that the APA failed to obtain legally mandated information in connection with the application and failed to make required findings and conclusions; and (4) that the provisions of the APA Act (Executive Law art 27) and regulations enacted thereunder which require that a public hearing be held if a subdivision permit is denied, but not if the permit is granted, constitute a violation of due process and equal protection.
*61 THE FACTUAL BACKGROUND
The sponsor owns two contiguous tracts of land in the Town of Duane; a parcel of 2,800 ± acres lies to the west of Route 30, and the above-mentioned parcel of approximately 406 acres lies to the east thereof. In February of 1982, the sponsor’s authorized representative, Spencer Thew, a licensed professional engineer, submitted preliminary materials to the APA in connection with the subject project. The materials consisted of a “Geotechnical Site Analysis” report, dated December 7, 1981; an application for conceptual review; and a preliminary lot layout for 93 residential lots to be located on the 406 ± acre lot. According to the APA, these materials did not constitute a formal application for a subdivision permit, but rather, preliminary material for agency review, so as to permit it to advise the sponsor informally of the feasibility of the plans. In fact, the preliminary nature of the submission was specifically discussed between Thew and an agency review specialist, Gary Duprey, on March 1, 1982, and confirmed in a March 2,1982 letter from Duprey to Thew. Such preliminary submissions and informal discussions are specifically encouraged by 9 NYCRR 572.3 and 574.2.
Between February 19, 1982 and March 22, 1983, a great deal of preliminary consideration, inspection, communication and recommendation took place. Studies were made and discussion was had with respect to the impact of the project on deer wintering areas, soil conditions, groundwater table, percolation rates, road locations, deep hole test pits, site topography and vegetation, and utility lines, and their impact on the project and site location. On March 22,1983, Thew submitted an application to subdivide the 406 ± acre parcel into 98 residential lots, to be accomplished in two phases: phase I was a proposed 49-lot residential subdivision on the northern half of the parcel and phase II was a 49-lot residential subdivision on the southern half. The application also indicated that a third phase, involving subdivision of the lands to the west of Route 30 into an additional 278 residential lots, was contemplated. However, no drawings were submitted with respect to the latter subdivision. During ongoing discussions between the agency staff and Thew, prior and subsequent to March 22, 1983, it was recommended that any development proposed on the 406 ± acre site be undertaken on the northern portion thereof, as it had the most environmentally compatible development potential.
On April 12, 1983, the agency issued a “Notice of Incomplete Permit Application” wherein it sought additional information *62 regarding the project application, especially whether the sponsor’s “project” consisted only of phase I or whether phases II and III were to be considered as well. On May 13, 1983, Thew submitted the requested information; with respect to the inquiry about the scope of the project, Thew stated that final approval for phase I was being sought at that time and that phases II and III were proposed for future development. Phase II development plans were to be submitted for approval upon successful completion of phase I and phase III development plans were to be submitted for approval upon successful completion of phase II. Based upon this response, the agency made a determination that the “project” subject to review was only phase I.
On June 3, 1983, the agency issued a “Notice of Application Completion”, pursuant to 9 NYCRR 572.8, with respect to the 49-lot subdivision. Notice of the project application was sent to all ascertainable adjoining landowners and to the Environmental Notice Bulletin for publication. In addition, a “Notice of Project Application Pending” was published on June 17,1983, in the Malone Evening Telegram. Comments were invited to be submitted by July 1,1983, in order to allow the agency sufficient time to evaluate them. The notices resulted in comments and inquiries from a total of four sources, two of which were the petitioners. Of the two remaining sources, one wanted nothing more than the sponsor’s address. Thereafter, the director of operations made a determination not to conduct a public hearing on the project application. The agency notified petitioner Bolton of this determination by letter of August 2, 1983.
The agency staff had reviewed proposed permit conditions it would recommend to the director of operations for inclusion in any order approving the project with both Thew and petitioner Bolton’s representatives. Based upon their input, the staff made final recommendations for conditions to the director of operations. On September 1, 1983, the director of operations issued permit No. 83-71 to the sponsor for what the APA contends was a 49-lot subdivision, consisting of 48 residential lots and the remaining contiguous lands of the sponsor, counted as one additional lot.*
THE AUTHORITY OF THE DIRECTOR OF OPERATIONS TO APPROVE THE PROJECT
9 NYCRR 572.11 (a) provides that “[t]he director of operations may review and approve, or approve subject to conditions, and *63 issue permits for, all projects other than (1) class B regional projects in land use areas governed by an approved local land use program, (2) subdivisions involving 50 or more lots, and (3) projects which have been the subject of a public hearing held pursuant to section 572.15 or Part 580 of these regulations.” The parties are in agreement that this section, by its terms, authorizes the director of operations to review and approve the subject application if it does in fact involve less than 50 lots.
Petitioners’ first contention is that there is no authority in the Adirondack Park Agency Act (Executive Law art 27 [first set out]) for the delegation of powers to the director of operations contained in 9 NYCRR 572.11 and that, accordingly, the director of operations lacked jurisdiction to review or approve the project.
The basis for this contention is alleged to exist in Executive Law §§ 803 and 809. Section 803 first provides that the Adirondack Park Agency consists of its members, they being the Commissioner of Environmental Conservation, the Secretary of State, the Commissioner of Commerce and eight members appointed by the Governor; it further provides, in the fifth unnumbered paragraph thereof, that “affirmative vote by a majority of the members of the agency, except as is otherwise specifically provided in this article, shall be required to exercise any power or function of the agency.” Section 809 (2) (a) provides, among other things, that an application for a class A regional project shall be made to the agency for approval of such project, and section 809 (3) (a) provides that the agency shall make a decision on a permit application.
The argument, then, is that statutory references to the agency are to the actual members, referred to by petitioners as the commissioners; that only the members may exercise any power or function of the agency, except as is otherwise specifically provided in article 27; that there is no provision in article 27 for review of project permit applications by the director of operations or anyone other than the agency; and that section 809 requires the agency (i.e., its members) to consider and decide project permit applications.
The argument has superficial appeal but overlooks some very basic problems. First section 803 itself provides (in the last sentence of the fifth paragraph thereof) that “[t]he agency may delegate to one or more of its members, officers, agents and employees, such powers and duties as it deems proper.” Second, the argument, carried to its logical conclusion, would bring about a ridiculous and impossible result. For instance, section *64 809 (2) (b) requires the agency to notify the project sponsor by certified mail whether or not the application is complete. Is it argued that the hands of all 13 of the members, or at least a majority thereof, must be on the letter when it is mailed?
Petitioners’ answer to these problems is that the agency has the authority to delegate minor ministerial powers and duties, but none other. The authority for this proposition is that section 803 vests in the agency authority and responsibility for exercise of “power[s] and function[s]” but only permits delegation of “powers and duties”. The argument, of course, is that the omission of the word “functions” from the delegation clause means that only the agency may perform its essential functions, and consideration and approval of project permit applications is one of these. The problem here is that petitioners have offered no legal authority for what the court considers to be an overly technical interpretation of section 803. No recognizable difference is seen between “powers and duties” and “function[s]”. In fact, if anything, the former appears to have stronger connotations of authority than the latter. Further, as quite properly argued by the APA, petitioners’ interpretation, would severely limit the agency’s ability to perform its duties. “It remains a basic principle of statutory construction that a court will ‘not by implication read into a clause of a rule or statute a limitation for which * * * no sound reason [can be found] and which would render the clause futile’ ” (Matter of Industrial Commr. of State of N. Y. v Five Corners Tavern, 47 NY2d 639, 646-647).
Petitioners next argue that even if 9 NYCRR 572.11 (a) does legitimately vest in the director of operations the power to review subdivisions of less than 50 lots, the subject project involved more than 50 lots, and the said director therefore lacked authority to review and approve the project. In support of this argument, petitioners first contend that the “project” was in fact phases I, II and III and that, accordingly, some 378 residential lots on over 3,000 acres of land are involved. In order to support this contention, petitioners utilize an extremely broad interpretation of the word “involved”. The argument is essentially that the mention of phases II and III on the application and permit means that they are “involved”.
What this argument fails to take into consideration is the fact that the project sponsor has discretion to define the scope of its project. In this case the sponsor specifically limited the project to the 49-lot subdivision on the northern half of the 406 ± acre parcel (phase I). The sponsor could have sought conceptual review of the entire three-phase project and a sectional *65 permit as to phase I, pursuant to Executive Law § 809 (13) (d). In fact, this appears to have been the sponsor’s initial intention; however, it subsequently and unequivocally elected not to avail itself of the benefit of conceptual review and adopted a “let’s see what happens with phase I and then decide where we go from there” attitude. This the sponsor was entitled to do. The risk which it took, of course, is that its election not to have the agency consider the latter phases could jeopardize the approval of those phases when and if application was made therefor, due to the nature and impact of phase I.
Petitioners’ next contention is that even if the subject project consisted of only phase I, more than 49 lots were involved since the sponsor sought approval for a 49-lot subdivision and the remaining land comprised at least one lot. The response of the APA is that it is not the number of lots applied for but the number which are “approvable” which controls. Neither party offers any direct legal authority for its contention, and it does appear that the issue has not been faced before. The court is far more persuaded, however, by the analysis of the APA than that of petitioners. “It is well settled that the construction given statutes and regulations by the agency responsible for their administration, if not irrational or unreasonable, should be upheld” (Matter of Howard v Wyman, 28 NY2d 434, 438). Not only does the court fail to find the APA’s interpretation to be irrational or unreasonable, it does, in fact, find it to be both rational and reasonable. The obvious purpose of 9 NYCRR 572.11 (a) and the delegation of authority contained therein is to relieve the agency members or commissioners of the need to concern themselves on a day-to-day basis with “small” projects. To concern the full agency with a 50-lot subdivision when it is apparent that only 49 lots could be approved would serve no useful purpose. Nor is this interpretation at all at variance with the language of the regulation, which speaks specifically of the authority of the director of operations to review, to approve and to issue permits for a subdivision of less than 50 lots.
Petitioners’ last contention on the issue of the authority of the director of operations to approve the application and issue the permit is that the remaining lands of the sponsor, counted by the respondents as one lot, in fact constitute more than one lot, thereby bringing the total number of lots involved to more than 49. Support for this argument is gained from the project application and the permit itself. The application indicates, and the findings of fact contained in the order of the director of operations granting the permit so find, that the sponsors intend to set *66 aside approximately eight acres of the retained land as a recreational lot, 125 acres as an open space lot with recreational trails, 185 acres for future development and an unspecified area for roadways. This, petitioners contend, brings about a total of at least 53 lots in the 406-acre parcel and at least one more in the larger parcel on the other side of the highway.
The position of the APA is that regardless of the various labels which were placed by the sponsor on different portions of the retained lands, the fact is that for “counting” purposes, they comprise one lot. This treatment, it is asserted, is consistent with the provisions of 9 NYCRR 573.4 (c) (1). Section 573.4 (c), entitled “Counting lots” provides as follows: “For the purpose of determining agency jurisdiction based upon number of lots, (1) any lot to be retained by the subdivider, and (2) all lots in the same land use area which are part of one project and which would otherwise be adjoining but which are located on opposite sides of a public or private road, or railroad or right-of-way owned in fee, shall be counted.” The court’s interpretation of this provision, and that of the APA, is that all retained lands of the sponsor, on both sides of the highway, shall be lumped together as one lot for counting purposes:
Petitioners argue that this result is ridiculous, as it places the director of operations in a position where he could continue to approve additional 49-lot subdivisions out of the diminishing retained lands on an indefinite basis or until no land remained. If this were the case, the obvious limitation on the authority of the director of operations, contained in 9 NYCRR 572.11 (a), would be circumvented and its purpose thwarted. However, in propounding this argument, petitioners have failed to take into account the cumulative nature of the agency’s review of projects under the APA Act. That is, on a subsequent application by the present sponsors (or their grantees, if applicable) for subdivision of the remaining lands, the 48 lots previously allowed will be added to the number of lots then involved for counting purposes (see, e.g., Executive Law § 810 [2] [c] [2]). This being the case, it goes without saying that any future subdivision of the remaining lands shall be beyond the jurisdiction of the director of operations.
Although not essential to making a determination that the remaining land constitutes one lot, it might be noted that the fact that the sponsor indicated an intention to dedicate the proposed roadways to the Town of Duane does not necessarily mandate a finding of present intention to make a conveyance thereof, as dedication can be effected without an express grant *67 or conveyance of title to lands lying within the roadway (see, e.g., Heyert v Orange & Rockland Utils., 17 NY2d 352). It cannot be realistically argued that the sponsor has indicated a present intention to convey any of the other lands.
The court is of the opinion that the argument of the petitioner in support of the proposition that the director of operations lacked jurisdiction or authority to approve the subject project is essentially an exercise in legal gamesmanship, where form takes precedence over substance and where words are made to mean what the proponent chooses them to. With enough effort, and petitioners’ analysis is obviously the product of a great deal, arguable support can be found for almost any proposition. It is useful, in such a situation, to withdraw temporarily from the fray and consider what it is that the combatants are really fighting over. In this case, one cannot help but wonder what benefit can accrue to petitioners by calling the retained land 1 lot, 100 or 1,000. Such nomenclature will not change the fact that the director of operations approved a 48-lot subdivision, nothing more and nothing less. How much better off would petitioners have been if the initial application had been for a 48-lot subdivision, if no mention had ever been made of phases II or III, if no representations had been made concerning utilization of a portion of the retained lands for recreational purposes or roadways, or if the sponsors did not own land across the highway? The court is of the opinion that petitioners would have been no better off at all.
THE AUTHORITY OF THE DIRECTOR OF OPERATIONS TO DETERMINE NOT TO CONDUCT A PUBLIC HEARING AND THE PROPRIETY OF THAT DETERMINATION
Having determined that the regulations of the APA say what they do and that the director of operations does have authority to make a determination to grant a permit for a 49-lot subdivision, the court must now ponder the question of whether the same director of operations has authority to determine whether or not to conduct a public hearing on the application. It should be noted at the outset that it seems to me that it probably takes somewhat less ingenuity to decide whether or not to conduct a public hearing than it does to consider and act upon the project application itself.
It is conceded that neither the APA Act nor the regulations promulgated thereunder contain a specific grant of authority to the director of operations to make a determination as to whether or not a public hearing should be conducted on an application for *68 a less than 50-lot subdivision. It is also conceded that 9 NYCRR 580.2 (b) and (c) do provide that the agency shall make the determination and that the agency may, in any particular case, delegate to the director of operations the authority to make the determination, which could be interpreted as meaning that a specific delegation is required in each case. However, the court feels that it would be senseless for the regulations to relieve the agency of the obligation to review inconsequential (involving less than 50 lots) projects, but yet require the members to sit down and agonize over whether or not to conduct a public hearing on the application.
9 NYCRR 572.11 (a) gives the director of operations the authority to “review and approve, or . approve subject to conditions, and issue permits for” projects involving less than 50 lots. This is a broad delegation of authority — broad enough to cover all intermediate steps necessary to bring about the natural culmination of the process. Any interpretation of this section which would grant the director of operations less authority than that required to accomplish that which he is empowered to accomplish (i.e., final determination of the application) is senseless. The court finds, accordingly, that the director of operations has the authority under section 572.11 (a) to make a determination as to whether or not to conduct a public hearing.
The court also finds no factual or legal support for the contention of the petitioners that the determination of the director of operations not to conduct a public hearing on the application constituted failure to perform a duty enjoined upon him by law, a determination in violation of lawful procedure, a determination affected by an error of law, or was arbitrary or capricious or an abuse of discretion. Substantially all of the factual allegations and legal argument offered in support of this point are premised upon what the court has determined to be the erroneous assumption that the subject project “involved” all three phases. As earlier stated, phase I is all that was involved. Considering that the project involved a mere 48 residential lots on in excess of 3,200 acres of contiguous land and that a total of three legitimate responses were received to the notice of the application it would have been most unusual to conduct a hearing. The record reveals that full consideration was given to the concerns of the very few who expressed opposition to the project and that, in fact, the permit was tailored to accommodate their concerns, with the consent of the sponsors. The court finds that none of the criteria enumerated in Executive Law § 809 (3) (d) or 9 NYCRR 580.2 (a) mitigated strongly in favor of a hearing in this case. The analysis propounded by the petitioners *69 would, require a hearing in all cases, a result directly opposite to the express language of the statute and regulations.
WHETHER THE APA OBTAINED ALL MANDATED INFORMATION IN REVIEWING THE PROJECT
As was the case with the latter portion of the previous point, the argument of the petitioner in support of the contention that the APA did not have before it all information mandated by law is premised largely, if not exclusively, upon the erroneous contention that the subject project was either a “large scale project” (9 NYCRR 570.3 [w]) or “other project to be undertaken in sections”. For the reasons previously stated, it is the court’s determination that the project was neither. While it was certainly within the power of the agency to broaden the scope of its review to the entire project, it was not obligated to do this.
The court finds, as is asserted by respondents, that the agency considered all of the developmental considerations of Executive Law § 805 (4) pertinent to the 49-lot subdivision and properly determined that the subdivision met the project approval criteria of Executive Law § 809 (10). More than adequate support for this finding is found in the affidavits of Rappaport and Duprey. Petitioners have come forward with nothing to controvert the allegations contained therein.
THE CONSTITUTIONAL ISSUE
Last, petitioners argue that the provisions of the APA Act and the regulations enacted thereunder, which require that a public hearing must be held if a subdivision permit is denied, but that no public hearing is required if the permit is granted, constitute a violation of due process and equal protection. The basis for the contention is that the public at large is entitled to at least as much protection under the APA Act as a project sponsor. I disagree. The APA Act is essentially nothing more or less than a massive zoning ordinance. It is the act itself, and all of the land use restrictions contained therein and in the regulations promulgated thereunder, which protects the interests of the public, or so it is intended (see, Executive Law § 802). It is the private landowner, the one whose fundamental right to lawful use of his own property is being infringed upon, who requires procedural protection. Thus, and properly, the law provides that the landowner be afforded the minimal protection of a public hearing before his application for administrative permission to use his own land as he deems fit can be denied.
Inasmuch as no suspect classification or fundamental rights are involved here, the burden is on the petitioners to establish *70 that there is no rational basis for the challenged differentiation (Montgomery v Daniels, 38 NY2d 41, 59-62). This they have wholly failed to do.
The petition is in all respects denied and dismissed.

 One of the 49 residential lots set forth on sponsor’s application, that designated as lot No. 44, was eliminated by the director of operations, with the subsequent consent of the sponsor, due to the slopes thereon.