Leonard GALLICK and Sonina Gallick, his wife, Individually and as Parents and Natural Guardians of Brittany Gallick, a Minor, Plaintiffs,

v.

Bruce BARTO and Betty Barto, his wife, Defendants and Third–Party Plaintiffs,

v.

Leonard GALLICK and Sonina Gallick, his wife, Individually and as Parents and Natural Guardians of Brittany Gallick, a Minor, Third–Party Defendants,

and

Shawnee Miller and Todd Long, Third–Party Defendants.

No. 4:CV–92–1426.

United States District Court, M.D. Pennsylvania.

July 26, 1993.

Joseph F. Orso, III, Casale & Bonner, Williamsport, PA, for plaintiffs and third-party defendants Gallicks.

John A. Mihalik, Bloomsburg, PA, for defendants and third-party plaintiffs Bartos.

John P. Pietrovito, Muncy, PA, for third-party defendant Miller.

Amy F. Ershler, Susquehanna Legal Services, Williamsport, PA, for third-party defendant Long.

## MEMORANDUM

McCLURE, District Judge.

### BACKGROUND:

On March 8, 1991, plaintiff Brittany Gallick, an infant then aged seven months, was bitten on and about the face by a ferret owned by Shawnee Miller and Todd Long. The bites left open wounds which have left scars on the face of Brittany. Her parents, Leonard and Sonina Gallick, initiated this action to recover for Brittany's injuries. Originally, the defendants were Bruce and Betty Barto, the landlords of Miller and Long. They raised affirmative defenses against the Gallicks, and eventually Miller and Long were joined as third-party defendants. The Gallicks also have been named as third-party defendants.

Before the court is a motion for summary judgment filed by Bruce and Betty Barto. The resolution of that motion will be determined by the answers to two primary questions: Is a ferret a wild animal? If so, can a landlord not in possession be held liable for injuries caused by a wild animal when the landlord may not have had actual knowledge of the animal's wildness?

As set forth at length below, we find that a ferret is a wild animal. Moreover, the landlords may be held liable, since a jury may find that they permitted Miller and Long to keep a wild animal on the property. The Bartos had the right to begin eviction proceedings to enforce the terms of the lease, and did not do so. While the landlords did not have the right to an immediate eviction of the tenants, they might have concluded eviction proceedings prior to the date of the incident in question. A jury could reasonably find that this constitutes control over the property. If the jury should so find, the landlords might be liable for injuries caused by a wild animal, the presence, if not the nature, of which they were aware.

### STATEMENT OF FACTS:

The material facts are undisputed. Leonard and Sonina Gallick are the natural parents of Brittany Gallick, a minor who was seven months old on March 8, 1991. Bruce and Betty Barto are the owners of a rental property located at R.D. #1, Box 355, Hughesville, Pennsylvania. On July 28, 1990, Todd R. Long signed a lease for the house in Hughesville. Sharon Miller signed the same lease on July 30, 1990. Long and Miller resided in the house on March 8, 1991. The lease indicated that a violation of the lease rules could be enforced with a 30-day notice of eviction. Paragraph 8 of the lease stated, "No Pets."

Approximately one week after Miller and Long moved into the Hughesville property, they informed Betty Barto that they had a ferret. Approximately two weeks after the signing of the lease, Betty Barto visited the premises and there observed one ferret. Betty Barto did not know what a ferret was; in fact, she thought that the ferret was a mink.

Neither Bruce Barto nor Betty Barto issued a 30-day eviction notice after having seen the ferrets. They claim that they had no actual knowledge of any violent propensities on the part of ferrets in general or the ferrets owned by Miller and Long in particular. Bruce and Betty Barto had no right to evict the ferrets or the tenants without legal process.

Three ferrets were purchased by Miller from the pet shop in which she worked and were kept as pets by Miller and Long. They were allowed to roam freely about the rental property and slept on the couch. Although there was a cage, it was used for keeping the ferrets' food and water bowls. The ferrets generally were playful, though some aggressive behavior may have occurred.

On March 8, 1991, Leonard Gallick and Sonina Gallick went to the house rented by Miller and Long at approximately 7:00 p.m. for social purposes. Brittany was left on the floor of the bedroom to sleep, and the door

was closed and secured by a chair. Sometime later, Sonina Gallick entered the bedroom to check on Brittany, and found that she had been bitten by one of the ferrets.

## DISCUSSION:

### I. IS A FERRET A WILD ANIMAL?

 In Pennsylvania, a person who keeps a wild animal, or a domestic animal with known vicious propensities, may be liable for injuries caused by the dangerous nature of the animal. *Summit Hotel Co. v. NBC,* 336 Pa. 182, 8 A.2d 302, 305–306 (1939); *Andrews v. Smith,* 324 Pa. 455, 188 A. 146, 147–148 (1936). The early cases indicate that the cause of action is for negligence, not strict liability: "The negligence is in keeping such an animal after notice . . .," *Andrews, supra,* 188 A. at 147 (quoted in *Summit Hotel Co., supra,* 8 A.2d at 305), although the Pennsylvania Superior Court has more recently discussed the keeping of wild animals in the context of strict liability. *Albig v. Municipal Authority of Westmoreland County,* 348 Pa.Super. 505, 502 A.2d 658, 662 (1985) (". . . the doctrine [of strict liability] has long been applied to the keeping of wild animals . . . .").[1]

If a ferret is a wild animal, then, its owner, and perhaps the owner's landlord, may be liable for injuries caused by the ferret. We conclude that, under the applicable principles of Pennsylvania law, a ferret is a wild animal.

### A. GENERAL FACTS ABOUT FERRETS

According to Webster's New World Dictionary of the American Language (College Ed. 1968), a ferret is "a kind of weasel, easily tamed and used for hunting or killing of rabbits, rats, etc. . . ." Generally, two types of ferrets are found in the United States: the black-footed ferret (*Mustela nigripes* ) and

the domestic[2] or common ferret (*Mustela putorius* or *Mustela putorius furo* ).

### 1. The Black–Footed Ferret[3]

The black-footed ferret has a yellow-buff coat, with brown fur on the top of the head and the middle of the back. It has a black facial mask and its feet, legs, and last quarter of its tail are black. The male black-footed ferret is larger than the female; it is about 22 inches long, approximately 5½ inches of which is its tail, and it weighs about 2 pounds.

The black-footed ferret is nocturnal and feeds mainly on prairie dogs. It moves into a prairie dog colony, occupies the tunnels, and hunts the occupants. Due to the extermination of prairie dogs, the black-footed ferret is now nearly extinct in the wild, if not already so. As of 1989, a few survived in captive breeding programs run by the Wyoming Game and Fish Department and in the National Zoological Park at Front Royal, Virginia.

Obviously, the ferret which injured Brittany Gallick was not this type of ferret.

### 2. The Domestic or Common Ferret

The domestic ferret varies in color from black or dark brown to albino, the latter being predominant. On average, it is about 19 inches long, including 5 inches of tail, and weighs about 2 pounds. Domestic ferrets will live for about four years. The females produce one, and sometimes two litters per year, with about 6 or 7 young per litter.[4]

The domestic ferret, sometimes given the subspecific name *M[ustela] putorius furo,* is thought to be a descendant of the European polecat. It was bred in captivity as early as the fourth century B.C. It is usually tame and playful, and is used to

---

1. The Superior Court, however, did not cite Pennsylvania cases for this proposition, relying instead upon Prosser and Keaton, *The Law of Torts* § 77. Regardless, the issue of strict liability for keeping wild animals was dicta, since the alleged ultrahazardous activity at issue in *Albig* was the collection and storage of a large quantity of water on a hillside reservoir.

2. It should be emphasized that the name "domestic ferret" is a zoological term, and the name

should not be construed as meaning that this type of ferret is legally "domestic."

3. This information was compiled from II Ronald M. Novak, *Walker's Mammals of the World* (5th Ed.1991) 1113–1114, and 11 Encyclopedia Americana 125.

4. 11 Encyclopedia Americana, *supra,* note 2, at 125.

control rodents and to drive rabbits from their burrows. It is now found in captivity in much of the world. An estimated 1 million are kept as pets in the United States, though there have been a few reported cases of rabid individuals and savage attacks on children. (*Washington Post,* 5 April 1988). Unlike the wild polecat, it is generally white or pale yellow in color. According to Asdell (1964),[5] females may have two or three litters annually. Both the domestic ferret and the polecat were introduced in New Zealand, and large feral populations are now established there. These animals are trapped for their fur in New Zealand, as well as in their original range....

II Ronald M. Novak, *Walker's Mammals of the World* 1112–1113 (1991). A polecat is "a European mammal, *Mustela putorius,* of the weasel family, having a blackish fur and ejecting a fetid fluid when attacked or disturbed[6] ..." The Random House Dictionary of the English Language (2d Ed.1987).

We turn now to the question of whether ferrets are wild animals. Hereinafter, the term "ferret" shall refer to common or domestic ferrets.

## B. PENNSYLVANIA LAW ON WILD ANIMALS

As noted above, under Pennsylvania law, one who brings onto his land and keeps a wild animal is liable for any injuries caused by the dangerous nature of the animal.

Both parties cite authorities which purport to define "wild animal" for the present purposes. Included are Corpus Juris Secundum and a statutory section which refers to the control of diseases among domestic animals.

However, as recently as 1987, the Commonwealth Court of Pennsylvania established a definition of "wild animal" for purposes of tort law. In *Deluca v. Whitemarsh Twp.,* 106 Pa.Cmwlth. 325, 526 A.2d 456 (1987), plaintiff had been injured by a wolf owned by a private citizen. In her complaint, she sought to recover from the township in which the owner lived, arguing that it had been negligent in allowing him to keep the wolf. Whitemarsh Township filed preliminary objections in the nature of a demurrer, contending that it was not liable because Pennsylvania has declined to waive governmental immunity for injuries caused by wild animals. *Deluca, supra,* 526 A.2d at 456–457.

The Commonwealth Court reviewed the Political Subdivision Tort Claims Act. 42 Pa.Cons.Stat.Ann. §§ 8541 et seq. A provision of the Act includes the following:

**(b) Acts which may impose liability.—** The following acts by a local agency or any of its employees may result in the imposition of liability on a local agency:

> · · · · ·
>
> (8) *Care, custody or control of animals.—*The care custody or control of animals in the possession or control of a local agency, including but not limited to police dogs and horses. Damages shall not be recoverable under this paragraph on account of any injury caused by wild animals, including but not limited to bears and deer, except as otherwise provided by statute.

42 Pa.Cons.Stat.Ann. § 8542(b)(8) (Purdon 1982). In short, local agencies may be liable for injuries caused by animals in the care, custody or control of its agents, but not wild animals. *Deluca, supra,* 526 A.2d at 457.

In deciding whether a wolf, in this case a 175–pound timber wolf, is a wild animal, the Commonwealth Court looked to the definition set forth in the now-repealed Pennsylvania Game Law, 34 Pa.Stat.Ann. §§ 1311.1 et seq. (Purdon 1967). That Law defined "wild animals" as "all animals other than domestic animals." 34 Pa.Stat.Ann. § 1311.101 (Purdon 1967). While "domestic animals" was not defined by the Game Law, wolves were included in the definition of "wildlife," and so the Commonwealth Court concluded that a wolf is a wild animal. *Deluca, supra,* 526 A.2d at 457–458.

Following the repeal of the Game Law and the enactment of the present Game and

---

**5.** Referring to S.A. Asdell, Patterns of Mammalian Reproduction (1964).

**6.** Hence the use in this country of the term to refer to skunks.

Wildlife Code, Pub.L. no. 442, No. 93, §§ 1 et seq., enacted as Title 34, Pa.Stat.Ann. (Purdon 1993 Supp.), the Court of Common Pleas was faced with the issue of whether a raccoon is a wild animal. *Holmes v. Borough of Lansdowne,* 9 Pa.D. & C.4th 344 (1991). That court looked to the Game and Wildlife Code for guidance. In the new Game and Wildlife Code, "wild animals" is defined as "[a]ll mammals other than domestic animals as defined in 1 [Pa.Cons.Stat.Ann.] § 1991 (relating to definitions)." 34 Pa.Cons.Stat. Ann. § 102 (Purdon 1993 Supp,). "Domestic animal" is defined as "[a]ny equine animal, bovine animal, sheep goat and pig." § 1991.[7] Moreover, "raccoon" is one of the animals listed in the definition of "furbearers" in § 102. Based on these two provisions, the court determined that a raccoon is a wild animal, and the Commonwealth has not waived immunity for injuries arising from its care and control. *Holmes, supra,* at 349–350.

Based upon *Deluca, supra,* it is apparent that the statutory section to be relied upon was the Game Law. Despite its repeal, the Court of Common Pleas relied upon the parallel act which was enacted in place of the Game Law, the Game and Wildlife Code. Under the Game and Wildlife Code, a wild animal is any animal that is not a domestic animal under the general definitions provision, § 1991. Under that section, a ferret is not a domestic animal. Therefore, a ferret must be a wild animal.

## C. GENERAL CONSIDERATIONS

In addition to the case law set forth above, we believe that there are general considerations which lead to the conclusion that a ferret is a wild animal.

First, ferrets have been kept by humans for some time basically because of their propensity to attack small animals. According to one article, they were first brought to this country from Europe in 1875 to hunt for rabbits. United Press International, Domestic News Section, Dateline: Fitchburg, Mass., March 22, 1988. The obvious conclusion from this fact is that, while people have kept ferrets, they have done so for the limited purpose of hunting, and ferrets serve that purpose only because of their ferocity.

For this reason, many authorities have warned against keeping ferrets as pets. "Some animals should never be pets. Turtles, poisonous snakes, chimpanzees, skunks, *ferrets,* and other *wild animals* bite and carry diseases. Furthermore, as this type of animal matures, it can become aggressive, . . ." Bruce A. Epstein, *Pets Can Play Important Part in Child's Growth,* St. Petersburg Times, November 25, 1989, at 2 (emphasis added). In 1986, Dr. Kenneth Kizer, then-director of the California Health Department, stated that there had been several documented instances in which savage attacks by ferrets had led to the death or maiming of babies. He attributed the attacks to the possibility that babies had odors similar to those of suckling rabbits. Jon Van, *Ferret Fad Dangerous, Vets Told,* Chicago Tribune, September 7, 1986, Section C at 1. Joining Dr. Kizer in his position were the American Veterinary Medical Association and the Humane Society of the United States. *Id.*

Several states do not allow residents to possess ferrets,[8] while others put limits on ferret ownership.[9] A large number of states

---

7. It may be noted that this definition does not include dogs and cats, both of which are clearly domestic animals. However, the legislature has so defined "domestic animal" in a number of statutes. *See, e.g.,* 3 Pa.Stat.Ann. § 459–501–A (Purdon 1993 Supp.) (the Dog Law); 3 Pa.Stat. Ann. § 331 (Purdon 1963) (regarding the prevention and suppression of diseases); 18 Pa.Cons. Stat.Ann. § 5511(q) (Purdon Supp.1993) (Crimes and Offenses, cruelty to animals). In each of these statutes, the Pennsylvania legislature has defined "domestic animal" to mean any of the above-enumerated animals, as well as dogs or cats, and, in the case of § 331, poultry.

8. Those jurisdictions not permitting possession or sale of ferrets are the District of Columbia, Michigan, Rhode Island, and South Carolina. *See* D.C.Code Ann. § 6–1008 (1981, WESTLAW 1993); Mich.Comp.Laws Ann. § 317.151 (West 1993); R.I.Gen.Laws § 20–16–3 (1992, WESTLAW 1993); S.C.Code Ann. § 47–5–50 (Law. Coop. 1992, WESTLAW 1993).

9. States restricting the possession, sale and/or ownership of ferrets include Georgia, Kentucky, and New York. *See* Ga.Code Ann. § 27–5–5(1)(A) (Michie 1992, WESTLAW 1993) (license or permit required); Ky.Rev.Stat.Ann. § 150.355

prohibits the use of ferrets in hunting.[10] Tennessee has specifically denominated ferrets as "Class III" wildlife.[11] Finally, in Maine, a ferret is not permitted off the premises of the owner unless caged, leashed, or otherwise under the actual physical control of the owner, and the seller of a ferret must provide the following written notification:

A. Ferrets have been known to attack humans, particularly children, for no reason and without warning.

B. There is no proven vaccine for rabies in ferrets nor is there an accepted procedure for judging a rabid ferret without sacrificing the ferret. A ferret which bites a person may be immediately seized and put to death by the State in order to obtain necessary test samples.

Me.Rev.Stat.Ann. tit. 7, § 3966 (West 1993).

## D. THE PARTIES' ARGUMENTS

In their brief in support of the motion for summary judgment, defendants Bruce and Betty Barto set forth various legal standards for determining whether an animal is wild or domestic. While their authority appears to be outdated, considering the authorities set forth above, we believe that ferrets would be wild animals under those authorities.

Defendants first argue that the court should apply the following distinction:

*Domestic animals* include those which are tame by nature, or from time immemorial

have been accustomed to the association of man, or by his industry have been subjected to his will, and have no disposition to escape his dominion.

*Wild animals* comprehend those wild by nature, which, because of habit, mode of life, or natural instinct, are incapable of being completely domesticated, and require the exercise of art, force, or skill to keep them in subjection.

Brief in Support of Defendants', Bruce Barto and Betty Barto, Motion for Summary Judgment at 5 (quoting *Com. v. Johnson*, 31 Som.L.J. 195, 208 (C.P.1975), which in turn cited C.J.S. *Animals* § 3.

As noted above, ferrets have been known to return to a feral state upon escaping, and have done so in large numbers in New Zealand. Novak, *supra.* Obviously, an animal which has a propensity to bite, which has traditionally been kept for the purpose of hunting rabbits and rats, and which will savagely attack small children without provocation is not an animal capable of being completely domesticated. It appears that people have kept ferrets as house pets only in recent years, and it cannot be said that they have been accustomed to this type of association "from time immemorial." At best, ferrets' natural predisposition to attack has been used as a tool by humans in ridding themselves of rodents and other pests. The instincts of a ferret clearly are not such as would allow it to be completely domesticated.

(Michie/Bobbs–Merrill 1992, WESTLAW 1993) (permit required); N.Y.Envtl.Conserv.Law § 11–0511 (West 1993) (permit required). Also, until recently, Pennsylvania required a permit for the ownership of ferrets, and it was illegal to sell ferrets to a person without a permit. 34 Pa.Stat. Ann. § 1311.413 (Purdon 1967), repealed and renumbered to § 1311.413a, Pub.L. 165, No. 40, § 4 (1983), renumbered section repealed, Pub.L. 442, No. 93, 7(a) (1987).

10. States prohibiting the use of ferrets in hunting include Connecticut, Delaware, Illinois, Iowa, Kansas, Kentucky, Maryland, Massachusetts, Minnesota, Nebraska, New Hampshire, New Jersey, New York, Ohio, West Virginia, and Wisconsin. *See* Conn.Gen.Stat.Ann. § 26–87 (West 1993); Del.Code Ann. tit. 7, § 771 (1992, WESTLAW 1993); Ill.Ann.Stat. Ch. 520, para. 5/2.33(d) (West/Smith–Hurd 1993); Iowa Code Ann. § 481A.53 (West 1993); Kan.Stat.Ann. § 32–

1003(d) (1992, WESTLAW 1993); Ky.Rev.Stat. Ann. § 150.355 (Michie/Bobbs–Merrill 1992, WESTLAW 1993); Md.Nat.Res.Code Ann. § 10–410(*l*) (1992, WESTLAW 1993); Mass.Gen.Laws Ann. ch. 131, § 77 (West 1993); Minn.Stat.Ann. § 97B.101 (West 1993); Neb.Rev.Stat. § 37–512 (1992, WESTLAW 1993); N.H.Rev.Stat.Ann. § 207:6 (1991, WESTLAW 1993); N.J.Stat.Ann. 23:4–14 (West 1993); N.Y.Envtl.Conserv.Law § 11–0901(5) (McKinney 1992, WESTLAW 1993); Ohio Rev.Code Ann. § 1533.02(C) (Anderson 1992, WESTLAW 1993); W.Va.Code § 20–2–5(13) (1992, WESTLAW 1993); Wis.Stat. Ann. § 29.03(9) (West 1992). Pennsylvania prohibited the use of ferrets in hunting under the former Game Law. 34 Pa.Stat.Ann. 1311.704(e) (Purdon 1967), repealed, Pub.L. 442, No. 93, 7(a) (1987).

11. Tenn.Code Ann. § 70–4–403(3)(D) (1992, WESTLAW 1993).

Defendants also cite *Andrews v. Smith, supra,* which distinguishes between wild animals such as "a tiger or a venomous reptile" and "horses, oxen and dogs." Certainly, the former are wild and the latter are domestic. The problem with such a simple distinction is that so many animals fall between the categories which these examples clearly delineate. For example, dogs may be domestic, but there are dogs, such as pit bulls, doberman pinschers, and rottweilers, the hazard of keeping which cannot be denied. Moreover, there are wild animals, such as box turtles or iguanas, which may be harmless in captivity. It is for this reason that an owner of a domestic animal with known dangerous propensities is also liable for injuries caused thereby.

In fact, in Pennsylvania, one can say that the policy of the state is to favor the party injured by animals. As discussed in *Deluca,* the Commonwealth has waived immunity for injuries caused by the negligence of its employees in the care, custody and control of domestic animals. Moreover, the Legislature has statutorily limited the application of the "one-bite" rule, which held that the owner of a dog had to have reason to know of his animal's vicious tendency, such as a previous bite, before he or she could be held liable for injury caused by the dog. *See* 3 Pa.Stat.Ann. § 459–502(b) ("... Any cost to the victim for medical treatment resulting from an attacking or biting dog must be paid fully by the owner of such dog....").

In their brief in opposition to the motion for summary judgment, plaintiffs rely heavily upon 3 Pa.Stat.Ann. § 331 for their definition of "wild animal." While that section is not conclusive in itself, in combination with at least three other instances of the same or very similar definitions, it is a strong indication that the Pennsylvania legislature strictly limits those animals which will be considered domestic. In its view, domestic animals are dogs, cats, and very common farm animals, including horses, cows, goats and pigs. *Deluca* and *Holmes* indicate that the view of the Legislature is shared by the courts.

■ In their reply brief, defendants argue that the facts of this case indicate that the ferrets owned by Miller and Long were domestic. They focus on the fact that the ferrets were permitted to roam about the house, that the cage was used only for food and water bowls, and that ferrets are sold in pet stores.

First, whether *these particular* ferrets were tame is not the issue, since a wild animal may be tame without changing its essential nature. A case cited by defendants, *Johnson, supra,* supports this conclusion. In that case, the defendants acquired two African leopard cubs, had them declawed and tamed, and accustomed them to captivity. The Court of Common Pleas of Somerset County held that their essential nature as wild cats remained unchanged. *Id.* at 208–209.

Second, the facts of this case do not necessarily support the contention that the ferrets were tame. A wild animal may be permitted to roam outside of its cage. There is no indication that they were permitted outside of the residence and would return when called or otherwise summoned. Moreover, two of the ferrets apparently were caged at the time of the attack on Brittany Gallick.

In sum, we are of the view that ferrets are an inverse of the types of dogs we have noted above. A pit bull may be considered a domestic animal because dogs generally are considered domestic animals. Therefore, a pit bull is a domestic animal with dangerous propensities.

A ferret, on the other hand, is a wild animal which people may, to a point, be successful in keeping in their home. Therefore, a ferret is a wild animal with domestic propensities. However, those propensities do not change its essential character as a wild animal. We hold that a ferret is a wild animal.

## II. CAN THE LANDLORD BE LIABLE?

■ In Pennsylvania, the general rule is that a landlord out of possession is not liable for injuries caused by animals kept by tenants when the tenant has exclusive control of the premises. *Palermo v. Nails,* 334 Pa.Super. 544, 483 A.2d 871, 873 (1984) (citations omitted). "However, a landlord out of pos-

session may be held liable for injuries by animals owned and maintained by his tenant when the landlord has knowledge of the presence of the dangerous animal and where he has the right to control or remove the animal by retaking possession of the premises." *Id.*

■ Defendants first argue that plaintiffs had exclusive control over the premises. We disagree. The lease specifically stated "No Pets" and expressly provided that the rules contained therein were enforceable through a thirty-day notice of eviction. Betty Barto learned of the presence of at least one ferret in early August, 1991. She saw one of the ferrets on the premises about one week later. Had she or her husband acted then to enforce the provisions of the lease, Miller and Long would have been evicted in due course. They clearly had control over the premises, at least to that extent.

■ The defendants also argue that, since the Bartos, the landlords, did not have actual knowledge that a ferret had dangerous qualities, they cannot be held liable. This contention also fails for two reasons. First, Betty Barto believed that the animal she saw was a mink, which is also a wild animal. Second, when the landlords allowed the tenants to keep a wild animal on the premises, they "stepped into the shoes" of the tenants concerning liability. Since the owner of a wild animal is legally responsible for all harm caused by the animal, the landlord is also liable. There is a legal presumption that the owner of a wild animal knows or should know, that is, has notice, of the animal's dangerous qualities. As the Pennsylvania Supreme Court stated many years ago, "The negligence is in keeping such an animal after notice." *Andrews, supra.*

### III. CONCLUSION

Since a ferret is a wild animal, the landlords were aware of the presence of at least one ferret, and plaintiffs may be able to prove that the landlords had the ability to exercise control over the premises prior to the incident in question, the landlords may be held liable under a theory of negligence. For all of these and the foregoing reasons,

the motion for summary judgment will be denied.

\* \* \*

An appropriate order shall issue.