## NEW YORK CITY FRIENDS OF FERRETS, Plaintiff,

v.

The CITY OF NEW YORK, New York City Department of Health, and Rudolph Giuliani, Margaret A. Hamburg, Martin B. Kurtz, Mark R. Chassin, and John G. Debbie, in their official capacities, Defendants.

No. 93 Civ. 6466 (AGS).

United States District Court, S.D. New York.

Feb. 9, 1995.

Robert T. Perry, Brooklyn, NY, for plaintiff.

Jeannette Koster, Asst. Corp. Counsel, Susan L. Watson, Asst. Atty. Gen., New York City, for defendants.

## AMENDED OPINION AND ORDER

SCHWARTZ, District Judge:

### BACKGROUND

New York City Friends of Ferrets, an unincorporated association of individuals in New York City who own or wish to own ferrets as household pets, bring this action challenging the legality of the City of New York's (the "City") prohibition against the keeping of ferrets within the City limits and the requirement that in any case where a ferret is reported to have bitten a human being, the ferret be immediately surrendered to the New York City Department of Health ("DOH") and humanely destroyed in order to conduct a rabies examination.[1]

---

1. The applicable provisions of law are as follows. Section 161.01 of the New York City Health Code, codified at Title 24 of the Rules of the City of New York (the "Health Code"), prohibits the keeping of dangerous animals in the City, providing in pertinent part as follows:

**Wild animals prohibited** (a) No person shall keep an animal of a species which is wild, ferocious, fierce, dangerous or naturally inclined to do harm ...

Section 11.65 of the Health Code provides that animals suspected of having rabies may be seized, destroyed and examined as follows:

**Control of animals affected with diseases communicable to man**

(b) .... An animal affected with or suspected of having anthrax, glanders or rabies may be impounded by the Department, a peace officer or other authorized person or agency and may be destroyed on the order of the Commissioner and its body disposed of in a manner approved by the Department.

\* \* \* \* \* \*

(c) An animal which, upon examination by a licensed veterinarian, is found to be rabid or is suspected of being rabid, or the body of an animal that died or is suspected of having died of rabies or which was killed because it was suspected of being rabid, shall be surrendered to the Department by the person who owns, possesses or controls it.

\* \* \* \* \* \*

(f) When the Commissioner determines that the potential for rabies epizootic exists in any area, he may declare that a dog or other animal subject to rabies that has bitten a human being shall be held for examination in a manner and place designated by the Department.

Likewise, Section 2.14 of Title 10 of New York Codes, Rules and Regulations ("N.Y.C.R.R.") provides that if a person is bitten by a wild animal suspected of having rabies, the animal shall not be held for observation but shall be destroyed immediately and submitted to a lab for examination, stating in pertinent part as follows:

**Reporting of suspected rabid animals and persons exposed to them.**

\* \* \* Action to be taken by health officer.

\* \* \* \*

(e) whenever, in accordance with this section, the health officer is notified of a person who has been bitten by or exposed to any animal suspected of having rabies, he shall, in a manner acceptable to him and at the owner's expense, cause the animal to be confined for 10 days, or he may, subject to the approval of

Plaintiff seeks a judgment declaring that the City's regulation of ferret ownership denies plaintiff's members of liberty and property without due process of law and violates the Equal Protection Clause of the United States Constitution. Complaint ¶ 2. Plaintiff also seeks injunctive relief: 1) prohibiting the City from enforcing its ferret regulation policies; 2) requiring the City to classify ferrets as domestic animals; and 3) requiring the City to provide plaintiff's members the same procedural rights in ferret biting incidents as owners of dogs and cats are afforded, including *inter alia* a hearing prior to euthanasia and testing in a biting incident. *Id.* ¶ 3.[2]

### The Domestic Ferret

Webster's New World Dictionary of the American Language (College Ed.1968) defines a ferret as "a kind of weasel, easily tamed and used for hunting or killing of rabbits, rats, etc. ..." Two types of ferrets can be found in the United States: the black footed ferret (Mustela nigripes) and the domestic or common ferret (Mustela putorius or Mustela putorious furo). Ronald M. Novak, Walker's Mammals of the World (5th Ed.1991), pp. 1113–1114; 11 Encyclopedia Americana 125. This action involves domestic ferrets[3] and, hereinafter, the term "ferret" shall refer to common or domestic ferrets. Domestic ferrets have been bred in captivity, initially for the purposes of hunting, since the fourth century B.C., and have, more recently, become a popular household pet in the United States. Additional facts relevant to the motion under consideration are discussed below.

> the owner, if known, or if its ownership cannot readily be determined, cause the animal to be destroyed immediately and have the animal or the animal's head submitted to a laboratory approved by the State Commissioner of Health for examination. Should the confined animal develop signs of rabies within the 10–day period, it shall be destroyed under the direction of the health officer and submitted to an approved laboratory for examination. Biting bats shall be considered presumptively rabid, and *wild animals suspected of being rabid shall not be held for observation and shall be destroyed immediately*, without injury to the head, *and submitted to an approved laboratory for examination.* (Emphasis added.)

### The City's Motion

■ The City moves to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(c) for judgment on the pleadings. We note that the parties have submitted affidavits and other evidence to the Court to be considered on the motion to dismiss. Such materials lie outside the four corners of the pleadings; accordingly, the court must either exclude the additional materials from our consideration and decide the motion based solely upon the complaint, or convert the motion to one for summary judgment under Fed.R.Civ.P. 56, *see Fonte v. Board of Managers of Continental Towers Condominium,* 848 F.2d 24, 25 (2d Cir.1988); *Carter v. Stanton,* 405 U.S. 669, 671, 92 S.Ct. 1232, 1234, 31 L.Ed.2d 569 (1972); *see generally* 5 C. Wright & A. Miller, *Federal Practice and Procedure,* ¶ 1366 (1990 & Supp.1992) (discussing the circumstances in which a court may convert a motion to dismiss into a motion for summary judgment). The Court has determined to consider materials which the parties have submitted; therefore, we elect to convert this motion to dismiss into a motion for summary judgment, and interpret the expanded record accordingly.

### DISCUSSION

#### Standard for Summary Judgment

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The

The City classifies ferrets as wild animals under the foregoing provisions, and, as noted, implements a policy of immediate euthanasia and testing of any ferret reported to have bitten a person.

**2.** Plaintiff also seeks injunctive relief against several New York State defendants restraining them from classifying ferrets as "wild animals and encouraging local public officials to automatically destroy any pet ferret reported to have bitten a human being." Complaint ¶ 4.

**3.** The name "domestic ferret" is a zoological term, and the name does not indicate that this animal is "domestic" for legal purposes unless so classified by the relevant regulatory body.

Second Circuit has stated that a "moving party may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case ..." *Gallo v. Prudential Residential Servs., Ltd. Partnership,* 22 F.3d 1219, 1222–3 (2d Cir.1994). The burden of proof, however, lies with the moving party and we must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought. *Id.* The moving party must satisfy its burden of demonstrating the absence of a genuine issue of material fact, which can be done by pointing out that there is an absence of evidence to support the nonmoving party's case (and as discussed above, all ambiguities are resolved in the nonmoving party's favor). *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–25, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The non-moving party then has the burden of coming forward with "specific facts showing that there is a genuine issue for trial," Fed. R.Civ.P. 56(e), by a "showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. at 322, 106 S.Ct. at 2552.

As set forth below, we find that the City has established that no issue of material fact exists as to plaintiff's claims against the City in this action.

## The Applicable Constitutional Standards

### Equal Protection

■ The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution guarantees that classifications imposed by law will not be used to burden a group of people arbitrarily. *See, e.g., New York City Transit Authority v. Beazer,* 440 U.S. 568, 587, 99 S.Ct. 1355, 1367, 59 L.Ed.2d 587 (1979). As the challenged Municipal Code provisions regulating ferret ownership do not classify people based on "suspect" criteria, such as race or nationality, they are constitutionally permissible under equal protection analysis so long they bear a rational relationship to a legitimate state interest. *Ohio Bureau of Employment Services v. Hodory,* 431 U.S. 471, 489, 97 S.Ct. 1898, 1908–09, 52 L.Ed.2d 513 (1977); *see also Dan-*

*dridge v. Williams,* 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970). Thus, "the Equal Protection Clause is satisfied so long as there is a plausible policy reason for the classification, ... the legislative facts on which the classification is apparently based rationally may have been considered to be true by the governmental decisionmaker, ... and the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational ..." *Nordlinger v. Hahn,* 505 U.S. ——, ——, 112 S.Ct. 2326, 2332, 120 L.Ed.2d 1 (1992) (internal citations omitted). The rational basis standard entails minimal scrutiny under the Equal Protection Clause and generally dictates judicial restraint. *Gregory v. Ashcroft,* 501 U.S. 452, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991). The Supreme Court has stated:

> The Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely we may think the political branch has acted. Thus, we will not overturn such a statute unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the legislature's actions were irrational.

*Vance v. Bradley,* 440 U.S. 93, 97, 99 S.Ct. 939, 942–943, 59 L.Ed.2d 171 (1979).

■■ The courts, moreover, show great deference to legislatures' choices in creating classifications, even where those classifications seem imperfect. A law will not fail to pass constitutional muster under equal protection analysis merely because it contains classifications which are underinclusive—that is, which "do not include all who are similarly situated with respect to a rule, and thereby burden less than would be logical to achieve the intended government end." L. Tribe, American Constitutional Law § 16–4 at 1447 (1988). The Supreme Court has emphasized that:

> The problem of legislative classification is a perennial one, admitting of no doctrinaire definition. Evils in the same field

534

may be of different dimensions and proportions, requiring different remedies. Or so the legislature may think. Or the reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislature. The legislature may select one phase of one field and apply a remedy there, neglecting others.

*Williamson v. Lee Optical of Oklahoma, Inc.*, 348 U.S. 483, 489, 75 S.Ct. 461, 465, 99 L.Ed. 563 (1955); *see also United States v. Carolene Products*, 304 U.S. 144, 58 S.Ct. 778, 82 L.Ed. 1234 (1938) (holding that if "the question is at least debatable" as to whether a classification has a rational basis under an equal protection analysis, the courts are bound to uphold the classification); *Dandridge, supra*, 397 U.S. at 485, 90 S.Ct. at 1161 ("In the area of economics and social welfare, a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect. If the classification has some 'reasonable basis,' it does not offend the Constitution simply because the classification 'is not made with mathematical nicety or because in practice it results in some inequality . . .' The problems of government are practical ones and may justify, if they do not require, rough accommodations—though illogical, they may be, and unscientific.") (internal citations omitted).

### Due Process

 In its exercise of the power to protect its citizens—to wit its police power [4]—the City is also limited by the constitutional requirement that the sovereign may not deprive citizens of property without due process of law. *Jacobson v. Massachusetts*, 197 U.S. 11, 25, 25 S.Ct. 358, 361, 49 L.Ed. 643 (1905). Where, as here, the exercise of police power does not affect fundamental rights, such as voting or freedom of speech, we apply the same rational basis analysis used under the constitutional guarantee of equal protection. *Massachusetts Bd. of Retirement v. Murgia*, 427 U.S. 307, 312, 96

4. The parties do not dispute that the City acts pursuant to its police power when it regulates the sale or ownership of animals for the purpose of protecting the health and safety of its citizens.

S.Ct. 2562, 2566, 49 L.Ed.2d 520 (1976). Thus, deprivation of private property pursuant to an exercise of police power is constitutionally permissible where the challenged legislative enactment bears a rational relationship to legitimate legislative goal or purpose. *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978).

### Rational Basis Analysis As Applied to Municipal Regulations

### Presumption of Constitutionality

 In applying the rational basis analysis to a health and welfare regulation, such as the portions of the Health Code at issue here, courts apply a basic test of reasonableness; that is, a police power regulation is to be upheld if the requirements of the law have a rational connection with the promotion and protection of public safety. *Kelley v. Johnson*, 425 U.S. 238, 247, 96 S.Ct. 1440, 1445, 47 L.Ed.2d 708 (1976); *Nebbia v. New York*, 291 U.S. 502, 537, 54 S.Ct. 505, 516, 78 L.Ed. 940 (1934); *see also People v. Stover*, 12 N.Y.2d 462, 240 N.Y.S.2d 734, 191 N.E.2d 272 (1963) (holding that any statute or local law designed to foster the public safety, health, and welfare must be upheld if it reasonably and properly furthers that goal). There is a heavy burden of proof imposed upon the party challenging a public safety law because such legislation is entitled to a strong presumption of constitutionality. *McGowan v. Maryland*, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961). Moreover, courts have noted that:

[t]he exceedingly strong presumption of constitutionality applies not only to enactments of the Legislature but to ordinances of municipalities as well. While this presumption is rebuttable . . . only as a last resort should courts strike down legislation on the ground of unconstitutionality. The ordinance may not be arbitrary. It must be reasonably related to some manifest evil which, however, need only be reasonably

*See, e.g., Sentell v. New Orleans and Carrollton R.R.*, 166 U.S. 698, 17 S.Ct. 693, 41 L.Ed. 1169 (1897).

apprehended. It is also presumed that the legislative body has investigated and found the existence of a situation showing or indicating the need for or desirability of the ordinance, and, if any state of facts or to be assumed justifies the disputed measure, this court's power of inquiry ends. Thus, as to reasonableness, plaintiffs in order to succeed have the burden of showing that "no reasonable basis at all" existed for the challenged provision of the ordinance.

*Lighthouse Shores, Inc. v. Town of Islip,* 41 N.Y.2d 7, 390 N.Y.S.2d 827, 359 N.E.2d 337 (1976) (citations omitted); *see also Montgomery v. Daniels,* 38 N.Y.2d 41, 378 N.Y.S.2d 1, 340 N.E.2d 444 (1975). The party challenging public safety laws must prove by clear and convincing evidence that the law is unconstitutional. *In Re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). For the reasons set forth below, we find that the undisputed facts before this Court demonstrate that plaintiff has failed to carry this burden, and therefore conclude that the challenged regulations constitute a reasonable response to the threat that ferrets pose to the health and safety of the citizens of New York City.

### The City's Evidence

■ The City has submitted significant materials in support of its decision to classify ferrets as wild animals and to insist upon the immediate euthanasia and testing of any ferret reported to have bitten a human. This evidence includes the affidavits of: Martin B. Kurtz, Director of the Bureau for Veterinary Public Health Services for the Department of Health ("Kurtz Aff."); Dr. Charles Rupprecht, Chief of the Rabies Section at the Centers for Disease Control and Prevention and Director at the World Health Organization Collaborating Centre for Reference and Research on Rabies ("Rupprecht Aff."); Dr. Kevin Reilly, Acting Chief of the Veterinary Public Health Section for the State of California Department of Health Services; Michael Shaw, Assistant Environmental Health Supervisor and Rabies Control Coordinator for the Department of Health and Environmental Control, Horry County, South Carolina ("Shaw Aff."); and Douglas Hubbard ("Hubbard Aff."), Coordinator of Technical Assistance, Loudoun County Health Department, Loudon County, Virginia.

The City explains its decisions to classify ferrets as a species which is "wild, ferocious, fierce, dangerous or naturally inclined to do harm," to prohibit the keeping of ferrets in New York City, and to destroy and examine any ferret reported to have bitten a human being and suspected of having rabies as the product of several public health and safety concerns. First, the City contends that, despite their recent popularity as household pets, ferrets remain prone to vicious, unprovoked attacks on humans, particularly children and infants. Kurtz Aff. ¶ 5–8. In support of this assertion, the City has submitted various epidemiological studies and monographs, the most extensive of which is the study *Pet European Ferrets: A Hazard to Public Health, Small Livestock, and Wildlife* ("*Pet European Ferrets*") conducted by the California Department of Health Services ("DHS"). This study was undertaken by DHS to investigate public health considerations relating to possible legalization of pet ferret ownership in California, and involved the agency's request for information (by means of publication in a DHS periodical) on ferret bites during the ten year period 1978–1987. Reilly Aff. ¶ 4. DHS received information on 452 ferret attacks from this period, with reports concentrated (425 episodes) in California and the neighboring states of Arizona and Oregon. *Id; Pet European Ferrets, supra,* at 4; *see also* Kurtz Aff. ¶ 5 (confirming the City's reliance on the DHS study, among others, in concluding that ferret bites occurred at a frequency which presented a public health concern). Other studies submitted by the City and reflecting the incidence of ferret bite incidents include: "Ferret Bites Increasing in Wisconsin," *Wisconsin Epidemiol. Bull.,* Vol. 9, p. 1–3 (1987) and Diesch, S.L., "Reported Human Injuries or Health Threats Attributed to Wild or Exotic Animals Kept as Pets (1971–1981)," *Journal of the American Veterinary Medical Association* ("JAVMA"), Vol. 180, p. 382–383 (1982).

The City has also submitted materials to illustrate the disturbing frequency among

these documented ferret bitings of unprovoked attacks on infants and small children, characterized in some instances by a large number of bites covering the child's face and body. The California DHS *Pet European Ferrets* study catalogued among its data 63 unprovoked attacks on infants and small children less than three years of age. Reilly Aff. ¶ 4; *see also* Supplemental Affidavit of Douglas M. Mansfield (Mansfield Suppl.Aff.) ¶ 7 (also detailing and providing, as exhibits annexed to the affidavit, documentation of two pet ferret attacks on infants, including one that became the subject of a federal civil tort action *Gallick v. Barto*, 828 F.Supp. 1168 (M.D.Penn., 1993) WL 284948 discussed further *infra* at 537); *see also* Paisley, J., M.D. & Brian A. Lauer, M.D., *Severe Facial Injuries to Infants Due to Unprovoked Attacks by Ferrets*, Journal of the American Medical Association, Vol. 259, No. 13, 2005–2006, April 1, 1988 (noting the alarming severity of ferret attacks and recommending that health professionals support legislation restricting the sale of pet ferrets until an effective rabies vaccine is available and further data regarding ferret bites are collected); Exhibit G annexed to Mansfield Aff. (numerous articles from newspapers across the United States providing accounts of ferret attacks on infants and small children).

The City also furnishes evidentiary support for its second articulated public health concern underlying its decision to prohibit ownership of ferrets as pets and to euthanize and test immediately for rabies ferrets that bite humans, namely, that failure to take such measures risks an increase in the spread of rabies in the New York City area. Kurtz Aff. ¶¶ 14–15. As a threshold matter, the City points out that New York City is presently under a rabies alert and rabies has been declared endemic in the Metropolitan area. Kurtz Aff. ¶ 14; Rupprecht Aff. ¶ 7.[5] Ferrets belong to the Mustelidae family of mammals, a family to which a particular rabies virus has become highly adapted. Rupprecht Aff. ¶ 8 (adaptation of rabies virus to particular mammalian family enhances perpetuation of that virus in nature); Kurtz Aff. ¶ 15. In ferrets, as in other animals, rabies virus infection typically follows a three-stage course: prodromal, furious, and paralytic. During the prodromal and furious stages, the infected animal can become irritable and vicious, biting or attacking other animals and people. Kurtz Aff. ¶ 16. Rabies is most commonly spread through the saliva of an infected animal that has bitten another animal or person. Kurtz Aff. ¶ 17. No test, however, permits detection of the rabies virus in the saliva of an animal. *Id.* The "viral shedding period" for a particular species refers to the time period in which the virus is available at an exit portal, such as saliva, for infectious transmission. Rupprecht Aff. ¶ 6.

The City's motivating public health concern relating to ferrets and rabies centers on the lack of knowledge of the behavioral symptoms of the rabid ferret and the indeterminate viral shedding period in the animal. Kurtz Aff. ¶ 17. The clinical signs of rabies in dogs and cats are well-known. *Id; see also* Rupprecht Aff. ¶ 4. It has also been established, moreover, that the time from which a dog or cat has the rabies virus in its saliva (i.e., begins its viral shedding period) to the time that the animal will exhibit the clinical behavioral signs indicating rabies does not exceed ten days. Kurtz Aff. ¶ 17; Rupprecht Aff. ¶ 4 (noting that excretion of virus in the saliva of a rabid dog or cat normally occurs after the onset of clinical signs of rabies, or 2–3 days before the onset of such signs, and almost invariably follows a 7 day course). Accordingly, the World Health Organization and the Compendium of Animal Rabies Control (the "Compendium"), last issued by the National Association of State Public Health Veterinarians ("NASPHV") in 1993, recommend that a healthy dog or cat that bites a person should be confined and observed for 10 days. Rupprecht Aff. ¶ 7. If the dog or cat exhibits behavioral signs suggestive of rabies, the

---

5. Since March 1992, the City of New York has received approximately 90 reports of rabid animals. Prior to that date, no reported incidents of rabies in terrestrial, indigenous animals had been reported for over fifty years. Kurtz Aff.

¶ 14. This rabies outbreak has not affected the entire country, and some upstate New York counties—where ferret ownership is legal subject to State licensing procedures—have not encountered a significant general rabies problem. *Id.*

foregoing authorities recommend that the animal be humanely killed, its head removed, and the brain tissue examined for the rabies virus. *Id.*

The viral shedding period in ferrets is unknown. Kurtz Aff. ¶ 18; Rupprecht Aff. ¶ 5. In addition, the clinical behavioral signs of rabies in ferrets are not well established, and such data as exist suggest that the clinical signs of the disease may be less noticeable in ferrets than in dogs and cats. Kurtz Aff. ¶ 18; Rupprecht Aff. ¶ 10. The AVMA, NASPHV, the United States Centers for Disease Control, and the Council of State and Territorial Epidemiologists all recommend that confinement and observation is not appropriate in the case of ferret bites, and that ferrets involved in biting incidents should be immediately euthanized and tested for the rabies virus. Kurtz Aff. ¶ 18; Compendium, Part III, "Rabies Control"; "Proven or Potential Zoonotic Diseases of Ferrets," *JAVMA*, Vol. 195, No. 7, October 1, 1989; Centers for Disease Control Morbidity and Mortality Weekly Report, "Rabies Prevention—United States," Vol. 40, p. 56, March 22, 1991; Joint statement of the National Association of State and Public Health Veterinarians and the Council of State and Territorial Epidemiologists, April 22, 1994 (concluding that the risks arising from the lack of data on the pathogenesis of rabies in ferrets and the serious nature of documented ferret attacks on small children mandate euthanasia and immediate testing of ferrets that bite other animals or humans; *see also* Rupprecht Aff. ¶ 7 (stating that the regulation of animals other than dogs and cats involved in biting incidents depends on factors including the species, circumstances surrounding the bite, and the epidemiology of rabies in the area, and emphasizing that New York City is presently considered endemic with rabies); Shaw Aff. ¶¶ 4–14 (recounting public health measures necessary to combat exposure of approximately 1200 persons to a rabid ferret in Horry County, South Carolina); Hubbard Aff. ¶ 2–6 (detailing rabies exposure in Loudon County, Virginia due to a rabid ferret purchased from a commercial breeder). Euthanasia and immediate testing remain the recommended course of action in biting incidents involving ferrets, the City points out, despite the approval by the United States Department of Agriculture of the IMRAB rabies vaccine for ferrets, because no vaccine is completely efficacious and the above discussed uncertainties regarding the etiology of rabies in ferrets persist. Kurtz Aff. ¶ 20; Rupprecht Aff. ¶ 7.

The final public health risk posed by ownership of ferrets as pets, according to the City, is the potential for ferrets to escape and form feral populations, as have stray cats and dogs. Kurtz Aff. ¶ 10. Such a development may lead to the decimation of certain wildlife species as well as excessive competition with other wild natural predators. *Id; Pet European Ferrets*, pp. 33–35 (noting studies and historiographies documenting that: 1) European ferrets imported and bred in Ohio in the late 19th century to kill rats developed feral populations and became a plague to poultry producers; 2) ferrets introduced in New Zealand to lower populations of rabbits have contributed to the extinction of 20 species of endemic New Zealand birds; and 3) a feral population of ferrets on San Juan Island, Washington has reduced the native mink population).

The City also emphasizes that the foregoing considerations have persuaded a number of states to prohibit or regulate the ownership of ferrets as pets in precisely the manner that the City has by means of its enactment of the Health Code regulations at issue here.[6] In addition, the City notes that the only Federal District Court to consider the issue determined that, under Pennsylvania law, a ferret is a wild animal. *Gallick, supra* (holding that the historical uses of ferrets,

---

**6.** The District of Columbia, Michigan, Rhode Island, and South Carolina prohibit the sale or ownership of ferrets. *See* D.C.Code Ann. § 6–1008; Mich.Comp.Laws Ann. § 317.151; R.I.Gen.Laws § 20–16–3; S.C.Code Ann. § 47–5–50. Georgia, Kentucky, and Maine restrict the sale, possession, and/or ownership of ferrets. *See* Ga.Code Ann. § 27–5–5(1)(A) (license or permit required); Ky.Rev.Stat.Ann. § 150.355 (permit required); Me.Rev.Stat.Ann. tit. 7, § 3966 (requiring written notification to purchaser that ferrets have been known to engage in unprovoked attacks on children and that public health authorities may demand immediate euthanasia of ferrets involved in biting incidents for rabies testing purposes).

their propensity to attack small animals, documented ferret attacks on human babies, the regulation of ferret ownership by other states, and ferrets' capacity to establish feral populations all militate in favor of classifying the ferret as a wild animal).

### Plaintiff's Response

Plaintiff offers two affidavits, those of Dr. Kent Marshall ("Marshall Aff.") and Dr. Freddie Ann Hoffman ("Hoffman Aff.") in support of its position. We note as a threshold matter that certain issues confront this Court with respect to the disinterested, unbiased and expert status of these affiants. First, both suggest an actual or apparent conflict of interest. It is not disputed that Dr. Marshall maintains a veterinary practice in Wayne County, New York, site of Marshall Farms USA, Inc.—a large ferret breeding farm owned by Dr. Marshall's parents. Mansfield Suppl. Aff. ¶ 5. Dr. Hoffman is the Vice–President of the American Ferret Association, Inc., an organization whose purpose is to promote the keeping of ferrets as pets. Hoffman Aff. ¶ 1. Even more significant, Dr. Hoffman submits no proof of her professional training or expertise in the veterinary issues at the core of this case. She is a board certified pediatrician specializing in the study of blood and tumors, and is presently employed by the U.S. Food and Drug Administration. Hoffman Aff. ¶ 2.

As a substantive matter, the Marshall and Hoffman affidavits, along with the other matter submitted by plaintiff, fail to establish by clear and convincing evidence that the City—relying upon the evidence discussed *supra* at 535–538—lacks a rational basis for its policy regulating ferret ownership and rabies testing in New York City.

A central tenet of plaintiff's constitutional claims is that pet ferrets pose no greater a danger to public health and safety—as measured by incidence of bites, severity of injury, and risk of rabies infection—than pet dogs. Plaintiff's Mem. at 13; Complaint 19–20; Hoffman Aff. ¶¶ 45–49, 59–69. The City, however, offers unrefuted evidence in support of the proposition that comparisons between dogs and ferrets with respect to the foregoing public health parameter are inapposite. First, there is reason to suspect that ferret bites are underreported relative to dog bites because of the frequent public health policy requirement that pet ferrets be euthanized if they bite humans as well as the lack of the almost uniform public health requirement that dog bites be reported. Kurtz Aff. ¶ 9; Jenkins, S., "More on Ferrets as Pets," (letter), *JAVMA*, Vol. 193, pp. 904–905 (1988); Reilly Aff. ¶ 7.[7] Accordingly, any comparison of rate or frequency of bites as between dogs and ferrets is likely to be skewed in favor of ferrets. Second, the more recent experience of adoption of ferrets in somewhat more significant numbers as domestic pets—and the lack of sound estimates of the number of pet ferrets—as opposed to the longstanding and well documented presence of dogs in that role, renders statistical comparisons of biting and rabies incidents between the two species of limited usefulness. *See, e.g.,* Rupprecht Aff. ¶ 9; Reilly Aff. ¶ 7.[8]

Plaintiff's criticism of the California DHS study *Pet European Ferrets* also falls short. Hoffman Aff. ¶¶ 16–34. In addition to the fact that the City states that it has relied on other public health resources and data in

---

7. Dr. Hoffman attempts to rebut this assertion by pointing out that many experts believe dog bites to be underreported. Hoffman Aff. ¶ 48 (citations omitted). Dr. Hoffman, however, misconstrues Mr. Kurtz's contention when she states "[t]he implication is that ferret bites are underreported while dog bites are accurately reported." *Id.* The point of the contention is not that dog bites are accurately reported, but that ferret bites are underreported *relative to* dog bites, and thus that comparisons of data drawn from bite incidents involving the two animals are not reliable.

8. Plaintiff likewise fails to refute the testimony of Dr. Rupprecht that the two week period between viral shedding and clinical signs of rabies observed in the dogs studied by Fekadu et al., referred to at ¶ 72 of the Hoffman Aff., occurred in dogs infected by an old world rabies virus isolate, and thus has little implication for regions (such as the United States) where enzootic rabies of canine origin is not present. Rupprecht Aff. ¶ 4. Nor does plaintiff dispute the assertion that the 10 day quarantine method applied by most public health authorities to dogs and cats involved in biting incidents has proven empirically effective over an extensive length of time. *Id.* at ¶ 4.

reaching its present regulatory stance with respect to ferrets, *see supra* at 535–536, plaintiff's various methodological criticisms of the DHS study (set forth in Dr. Hoffman's affidavit) simply fail to adequately counter the testimony of Dr. Reilly that the "active surveillance" method used in the DHS report to gather retrospective data on ferret bite incidents is a standard epidemiological method. Reilly Aff. ¶ 6.

With respect to the pathogenesis of rabies in ferrets, plaintiff's own expert, Dr. Hoffman, has acknowledged in her writings on the subject of ferrets as pets that:

> The duration of viral shedding following exposure to rabies has not yet been adequately determined in ferrets. Therefore, no quarantine period can be recommended. As a result, once a ferret has bitten a person, local health authorities may require that the ferret be euthanized for rabies testing regardless of immunization status. For this reason, ferret advocates consider the evaluation of the viral shedding time in the context of a well-controlled study to be the single most important issue impacting on the health and welfare of the pet ferret today.

"The Domestic Ferret—Pet of the Nineties?," *FDA Veterinarian*, Vol. Vi, No. 3, p. 1 (May/June 1991). Plaintiff submits no such study to this Court, nor furnishes evidence that any of the foregoing national animal public health organizations have been made aware that such data exists and is reliable. The only studies referenced by Dr. Hoffman relating to rabies in ferrets, *see* Hoffman Aff. ¶¶ 67–69, are cited for the proposition that "ferrets, rarely, if ever excrete virus in their saliva." *Id.* at ¶ 67. Plaintiff, however, does not dispute that these studies involved strains of rabies which are not found in the United States, and thus provide scant support for the unqualified, conclusive, and sweeping declaration made by Dr. Hoffman with respect to the rabies risk posed by ferrets. Rupprecht Aff. ¶ 11. In short, plaintiff fails to dispute the City's evidence in connection with one of its most pressing articulated concerns in regulating ferret ownership—to wit, the uncertain viral shedding period in rabid ferrets—and makes no showing with respect to Dr. Hoffman's claims regarding the dangers posed by rabid ferrets.

Finally, plaintiff emphasizes that New York City does not regulate pit bull terriers, which have been shown to be dangerous in certain circumstances, and suggests that the absence of such regulation establishes a constitutional infirmity, under the Equal Protection Clause, of the Health Code regulations relating to ferrets. Plaintiff's Mem. at 13, n. 10; Plaintiff's Supplemental Mem. 15–23. We disagree. As noted *supra* 533–534, the Constitution does not prohibit underinclusive statutes per se. That the City has chosen, in the field of ownership of animals, to regulate ferrets and not pit bull terriers, simply embodies the permissible exercise of its discretion to address "[e]vils in the same field [which] may be of different dimensions and proportions, requiring different remedies ... The [City] may select one phase of one field and apply a remedy there, neglecting the others." *Williamson, supra,* 348 U.S. at 489, 75 S.Ct. at 465; *see also Garcia v. Village Tijeras,* 108 N.M. 116, 767 P.2d 355 (stating, in the context of upholding banning the ownership of pit bull terriers, that "[t]o satisfy equal protection tenets, it is not necessary that the Village address all potential threats from all breeds of dog; instead, the Village was entitled to address a phase of the problem that was of acute concern"), *cert. denied,* 107 N.M. 785, 765 P.2d 758 (1988).[9] Plaintiff's arguments with respect to regulation of pit bulls, and, in fact, plaintiff's appeal to the regulation of dogs and cats in general, betray its fundamental misconception of constitutional equal protection and due process analysis as such analysis applies to public safety

---

9. We note, moreover, that numerous courts have upheld municipalities' right to define and regulate pit bull terriers on the basis of evidence similar to, and, in some cases, less compelling than that submitted by the City on this motion. *See, e.g., Vanater v. Village of South Point,* 717 F.Supp. 1236 (S.D.Ohio 1989); *American Dog Owners Association, Inc. v. Dade County, Florida,* 728 F.Supp. 1533 (S.D.Fla.1989); *Starkey v. Township of Chester,* 628 F.Supp. 196 (E.D.Pa. 1986); *Garcia, supra; Dog Federation of Wisconsin, Inc. v. City of South Milwaukee,* 178 Wis.2d 353, 504 N.W.2d 375 (Wis.App.1993).

laws. The Constitution simply does not guarantee owners of ferrets regulatory status precisely equal to the status of owners of other animals, even potentially dangerous animals, but rather mandates only that the decision of the sovereign to regulate them, as well as the nature of that regulation, have a rational basis and not be undertaken and applied arbitrarily and capriciously. Here, the undisputed evidence, discussed *supra* at 535–538, establishes that the City's ban on ferrets and its summary euthanasia and testing of ferrets that bite humans has ample basis in public health concerns regarding the propensity of pet ferrets to bite, particularly infants and small children, and the uncertain pathogenesis of rabies in domestic ferrets;[10] therefore, the City's regulation of ferret ownership cannot be deemed arbitrary or irrational.

## CONCLUSION

In our view, the City has furnished ample support for its decision to act upon its concerns with respect to the ownership of pet ferrets by New York City residents. At best, plaintiff has demonstrated that, in light of the lack of exhaustive data on rabies in ferrets and the frequency of ferret attacks relative to other animals, the public health danger posed by ferret ownership is a "debatable" question *see Carolene Products, supra* at 533, deserving of further study and, perhaps, reconsideration by the City. We observe that ferret advocates have in fact persuaded numerous states to permit ferret ownership (including those areas of New York State outside of New York City) and/or a quarantine process for ferrets involved in biting incidents. *See* Hoffman Aff. ¶ 10, 74. As the legal authorities set forth *supra* at 533–535 make clear, however, in such a circumstance the courts are not only ill-advised and ill-equipped to intrude upon the legisla-

tive and agency decisionmaking process of a particular municipality, but prohibited from doing so by longstanding judicial interpretation of the Due Process and Equal Protection Clauses of the Constitution. While the genuine and sincere affection of the members of the New York Friends of Ferrets for their pets is evident from plaintiff's submissions in this action, the law is clear that under the undisputed facts before this Court, their recourse lies with the executive agencies and legislative bodies responsible for protecting the health and safety of the public. Accordingly, we grant the motion of the City for summary judgment dismissing the complaint.[11]

Complaint is dismissed.

SO ORDERED.

---

10. Because we find that the challenged regulations have a rational basis in these public health considerations, we need not address the City's final purported rationale for the Health Code provisions at issue here, namely, the risk of feral populations formed by escaped pet ferrets.

11. In light of our finding that the City's policies with respect to the subject regulations are constitutional, we also dismiss plaintiff's claims against

the State defendants for classifying ferrets as wild animals and allegedly encouraging the City's practice of immediately destroying and testing ferrets that bite humans.

The individual City defendants are sued only in their individual capacities. The City's motion for summary judgment having been made on behalf of the City and its officials encompasses any claims against such defendants.